In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-1295, 99-1297 & 99-1346

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JAMES EDWARD BRAGG, CHANCE CALVIN GAINES
and BUDDY VERNON FRAZIER,

Defendants-Appellants.

Appeal from the United States District Court
for the Western District of Wisconsin.
No. 98-CR-38-C--Barbara B. Crabb, Judge.

Argued September 30, 1999--Decided March 21, 2000

Before HARLINGTON WOOD, JR., COFFEY and EVANS, Circuit
Judges.

COFFEY, Circuit Judge.  On April 2, 1998,
Defendants-Appellants James Bragg ("Bragg"),
Chance Gaines ("Gaines") and Buddy Frazier
("Frazier") were charged in a sixteen-count
indictment with violations of both the Clean Air
Act and the Social Security Act./1 In October
1998, Bragg, Gaines and Frazier entered guilty
pleas to count one of the indictment pursuant to
written plea agreements in which the government
agreed to drop the remaining counts. On January
28, 1999, a joint sentencing hearing was held and
Bragg, Gaines and Frazier were sentenced to 24,
33, and 30 months' imprisonment, respectively./2
On appeal, the defendants challenge their
sentencing adjustments for: (1) involving
vulnerable victims; (2) their aggravating roles
in the conspiracy; and (3) causing a "conscious
or reckless risk of serious bodily injury." We
AFFIRM.

I. BACKGROUND

    For approximately 17 years, Frazier was a self-
employed labor contractor for asbestos-abatement
projects, supplying asbestos removal work crews
for projects in Alabama, Georgia, Florida,
Kentucky, Mississippi, North Carolina and
Tennessee. In their effort to carry out the

conspiracy, the defendants on two separate occasions recruited men from a shelter for the homeless in Chattanooga, Tennessee, known as the "Community Kitchen."/3 The first recruitment occurred in February 1996, when Frazier recruited more than a dozen men, including men from the Community Kitchen, and drove them to Memphis, Tennessee to attend a four-day asbestos "supervisor/contractor" training course conducted by Professional Services, Inc. Each worker was required to "sign in" to the course with their name and social security number. All the workers passed the course, including Bragg who never attended the course but was fraudulently "signed in" by Frazier./4 Although Professional Services, Inc. issued the supervisor training course certificates (19 in all) in the name and social security number of each worker who "signed in," none of the men received their certificates; they were sent to and retained by Frazier.

In August 1996, Frazier was hired as an asbestos-abatement subcontractor to supply asbestos removal labor and supervision at the Weyerhaeuser plant in Marshfield, Wisconsin. Frazier in turn hired his nephew Bragg and his friend Gaines to help supervise the removal work. At Frazier's direction, Gaines drove approximately 8 workers from Tennessee to Madison, Wisconsin, and joined Frazier and Bragg to apply for asbestos-abatement supervisor identification cards at the Wisconsin Department of Health and Family Services. Except for Frazier and only one of the workers, Terry Cameron, none of the workers attended the Memphis training course or received any formal training in asbestos removal. Nevertheless, to secure the supervisor identification cards, the defendants fraudulently submitted the Memphis training course certificates as proof of their crew's training as asbestos-abatement supervisors./5

Defendants recruited men from the Community Kitchen on a second occasion on approximately September 19, 1996. Needing more men for the Weyerhaeuser project, Bragg returned to Tennessee and recruited another crew of workers. At Frazier's direction, Bragg went to the Community Kitchen and recruited approximately a dozen new laborers. Although none of these men had any formal training or certification in asbestos-abatement work, Bragg drove these untrained recruits some 800 miles to Marshfield, Wisconsin, in the bed of an uncovered pickup truck. After checking this crew into hotel rooms, they were transported to the job site and immediately put to work removing asbestos.

The Weyerhaeuser plant in Marshfield, Wisconsin contained substantial amounts of "regulated

asbestos-containing material,"/6 including approximately 7,967 feet of pipe asbestos insulation and 958 square feet of "mag block" asbestos insulation. Under the Clean Air Act, any "owner or operator of a renovation or demolition activity" who removes a specified minimal amount/7 of "regulated asbestos-containing material," must comply with numerous requirements, including: (1) the "asbestos-containing material" must be "adequately wet" during stripping, cutting or removal operations; (2) the "asbestos-containing material" must be carefully lowered to the floor or ground and not dropped, thrown, slid, or otherwise damaged; (3) the "asbestos-containing material" must be sealed in leak tight containers while wet; and (4) the "asbestos-containing material" may not be removed, disturbed, or otherwise handled unless a foreman or management-level person who has been trained in the means of complying with the applicable standards is present on-site./8 In general, applicable federal regulations/9 also require that any asbestos removed be secured with "glove bags"/10 or performed within a "negative pressure enclosure."/11

Relying on statements taken from the workers and a subsequent investigation conducted by both state and federal officials, it was revealed that the defendants' asbestos removal operation failed to comply with any of the regulations relating to "negative pressure enclosures," glove bagging and the "wetting" down of the asbestos prior to removal. In fact, the homeless workers were directed to "just get the asbestos material out fast" and instructed to break the dry asbestos off in chunks and then drop it into bags or let it fall onto the plastic spread out over the floor; again, all performed without sufficient water to properly moisten the asbestos and often at night by flashlight./12 The investigation also revealed that a homeless worker recalled seeing asbestos "particles floating in the air."

The defendants' asbestos removal project fell on hard times when the homeless men began to complain about working long shifts, not being paid and poor living conditions. Dependant on Frazier for food and housing, many of the men visited the local St. Vincent DePaul Society to supplement the inadequate meals Frazier provided, while others walked off the job and went so far as to sleep on the streets. On September 26, 1996, the Marshfield Police questioned a man sleeping on the streets and observed that he was carrying identification indicating that he worked at the Weyerhaeuser site. Another worker contacted the police to complain about the working conditions and supplied information concerning the fact that they were not only

given, but instructed as well to use the false identification cards. Around the same time that these problems were arising, Gaines drove five of the homeless men to the Wisconsin Department of Health and Family Services in Madison, Wisconsin on September 27, 1996, where, as before, he submitted fraudulent applications for identification cards using the Memphis training certificates./13

In an effort to determine if there was any validity to the various complaints, on October 1, 1996, Wisconsin state officials commenced an unannounced inspection of the Weyerhaeuser site and observed numerous violations of state regulations and federal Clean Air Act regulations dealing with asbestos removal, including, but not limited to, substantial amounts of dry friable asbestos, and the throwing of asbestos debris bags out of second floor windows to the ground. Once their misconduct was discovered, the defendants immediately left the Weyerhaeuser site and drove as many members of their crews as they could accommodate back to Tennessee, leaving the remaining homeless workers stranded in Marshfield, Wisconsin.

Defendants Bragg, Gaines and Frazier were arrested thereafter on different dates in April 1998, near Chattanooga, Tennessee, and, as previously mentioned, pled guilty to count one of the indictment in which they were charged with conspiring to violate the Clean Air Act as well as the Social Security Act. At sentencing, the judge ordered upward adjustments for their Clean Air Act offenses as follows: two levels for each of the defendants because under United States Sentencing Commission, Guidelines Manual, sec. 3A1.1(b) (Nov. 1998), the offense involved vulnerable victims; four levels for Frazier under U.S.S.G. sec. 3B1.1(a), for his leadership role in the conspiracy as the "organizer or leader" of a criminal activity involving five or more persons; and only three levels for Gaines and Bragg under U.S.S.G. sec. 3B1.1(b), as they were determined to be merely "managers or supervisors" of a criminal activity. With respect to the penalties imposed for their Social Security Act offenses, the judge adjusted each Defendant's offense level by seven under U.S.S.G. sec. 2F1.1(b)(6)(a), after finding that the offense involved "the conscious or reckless risk of serious bodily injury."/14

II.  ISSUES

On appeal, the defendants do not challenge their plea agreements or the designation of their base offense levels; they only challenge the previously mentioned upward adjustments for:

involving "unusually vulnerable" victims; their aggravating role in the crimes; and involving "the conscious or reckless risk of serious bodily injury."

III.  DISCUSSION

A.  Vulnerable Victim

The defendants initially challenge the district court's two point vulnerable victim adjustments by arguing that: (1) the government failed to demonstrate specific evidence of the homeless workers' unusual vulnerability; (2) economic status can never be grounds for vulnerability; and (3) the government failed to establish that the "victims were targeted on account of their vulnerability."/15 We review de novo a district court's application of a sentencing guideline but defer to its findings of fact unless they are clearly erroneous. See United States v. Castellanos, 165 F.3d 1129, 1131 (7th Cir. 1999). "To the extent the sentencing decision involves questions of fact, we will not disturb the district court's findings unless we have a definite and firm conviction that a mistake has been made." United States v. Brierton, 165 F.3d 1133, 1137 (7th Cir. 1999). A sentencing judge's factual findings that a defendant preyed on "unusually vulnerable" victims is reviewed for clear error. See United States v. Snyder, 189 F.3d 640, 649 (7th Cir. 1999), cert. denied, 120 S. Ct. 839 (2000).

Under U.S.S.G. sec. 3A1.1(b)(1), the sentencing judge must enhance a defendant's sentence by two levels if "the defendant knew or should have known that a victim of the offense was a vulnerable victim." The accompanying application note explains that this adjustment

applies to offenses involving an unusually vulnerable victim in which the defendant knows or should have known of the victim's unusual vulnerability. The adjustment would apply, for example, in a fraud case in which the defendant marketed an ineffective cancer cure or in a robbery case in which the defendant selected a handicapped victim.

U.S.S.G. sec. 3A1.1, cmt. (n.2) (emphasis added).

In this case, the district court found that the workers recruited from the Tennessee homeless shelter were particularly susceptible due to their poverty, homelessness and other factors that led them to spend time at the shelter, including the possibility that they were seeking "help with their alcohol problems or drug problems, for literacy training, for help with

psychiatric problems, [and] for help with just learning how to get a job." The judge further found that the fact that Gaines traveled more than 800 miles from Wisconsin to Tennessee to recruit the homeless men from the Community Kitchen strongly suggests that they were selected due to their vulnerability. In making her conclusions, the sentencing judge relied upon various evidence, including: a report from the assistant director of the Community Kitchen; evidence and statements made in relation to the defendants' recruitment of the workers; and a report from the director of services for the St. Vincent DePaul Society outreach facility, describing how the homeless workers visited the facility seeking food, clothing and other basic services. The judge thus concluded,

I am persuaded that the defendants in this case did target vulnerable victims when they went to a homeless shelter and recruited people that they could talk into coming up to Wisconsin. People they had good reason to suspect were not well-connected, would not complain about conditions that any other worker would complain about, who were absolutely destitute, who might very well have drug, alcohol and psychiatric problems and would be even less in a position to show any sign of resistance to the conditions to which they were going to be subject[ed].

In light of the sentencing judge's well supported factual findings and the deference we necessarily afford them, we are of the opinion that the court's finding of "unusual vulnerability" was based on sufficiently specific evidence./16

Additionally, the defendants' argue that "economic status can never be grounds for vulnerability" and furthermore that the government was required to establish that they targeted the victims due to their vulnerability. In essence, the defendants attack the court's findings for equating the homeless workers' unemployment with "unusual vulnerability." The court's findings, however, relied on many factors other than unemployment, including the fact that the homeless men were "absolutely destitute" and might very well have had literacy, "drug, alcohol and psychiatric problems and would be even less in a position to show any sign of resistance to the conditions" that they faced. Indeed, the defendants do not dispute that they specifically recruited these untrained workers from a homeless shelter, and acted unlawfully when exposing them to uncapsulated asbestos particles and failed to provide them with adequate asbestos removal training or materials to contain the asbestos.

Further, though we believe the facts clearly

establish "targeting,"/17 we wish to make clear that the government is not required to show that the defendants targeted the victims on account of their vulnerability. As we ruled in Snyder, 189 F.3d at 649, pursuant to the Sentencing Commission's November 1, 1995 amendments to the Sentencing Guidelines, there no longer is a requirement that the sentencing judge find that a defendant specifically targeted a victims' vulnerability under section 3A1.1. Defendants even acknowledge in their brief that the application notes to section 3A1.1 were amended in 1995, specifically removing any "target[ing]" requirement. Indeed,

[t]he 'vulnerable victim' sentencing [adjustment] is intended to reflect the fact that some potential crime victims have a lower than average ability to protect themselves from the criminal. Because criminals incur reduced risks and costs in victimizing such people, a higher than average punishment is necessary to deter the crimes against them.

United States v. Grimes, 173 F.3d 634, 637 (7th Cir. 1999). Taking into consideration these reasons as well as incorporating the sentencing judge's findings of fact, we reject the defendants' arguments and conclude that the judge's vulnerable victim adjustments were not clearly erroneous.

B.  Aggravating Roles

The defendants do not challenge the court's factual findings relating to their respective leadership and supervisory roles in the criminal violations; instead, they argue that their aggravating criminal conduct was double counted when it was used both to justify a sentencing adjustment and to attach criminal liability in the underlying conspiracy to violate the Clean Air Act. This presents a legal question regarding the meaning and application of the Guidelines and hence triggers de novo review. See United States v. Hach, 162 F.3d 937, 949 (7th Cir. 1998), cert. denied, 119 S. Ct. 1586 (1999); Castellanos, 165 F.3d at 1131.

The bar on double counting "comes into play only if the [underlying] offense itself necessarily includes the same conduct as the [adjustment]." See United States v. Senn, 129 F.3d 886, 897 (7th Cir. 1997) (emphasis in original). Liability under the Clean Air Act attaches to an "owner or operator" of pollution, defined as "any person who owns, leases, operates, controls, or supervises the facility being demolished or renovated or any person who owns, leases, operates, controls, or supervises

the demolition renovation operation." 40 C.F.R. sec. 61.141. Conversely, in order for one to be classified as a "leader" or "supervisor" for purposes of an aggravating role sentencing adjustment under U.S.S.G. sec. 3B1.1, a defendant must have been the "organizer, leader, manager, or supervisor of one or more other participants." U.S.S.G. sec. 3B1.1, cmt. (n.2)./18 Application Note Four illustrates the type of leadership and supervision the adjustment addresses:

In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

U.S.S.G. sec. 3B1.1, cmt. (n.4).

A plain reading of the regulations relating to criminal liability under the Clean Air Act and the aggravating role adjustment guideline reveals significant differences. The sentencing adjustment does not automatically attach upon a showing of Clean Air Act liability; hence, the adjustment disregards mere "titles" and attaches to conduct far more culpable than merely being an "owner or operator." In other words, the aggravating role adjustment addresses a defendant's actual level of management and responsibility "over the property, assets, or activities of a criminal organization." U.S.S.G. sec. 3B1.1, cmt. (n.2). Moreover, the aggravating role adjustment considers a multitude of factors that are not contemplated by the defendants' underlying conspiracy to violate the Clean Air Act, including the recruitment of accomplices, the degree of planning or organizing, the nature and scope of the crime and the degree of control and authority exercised by the defendants. See U.S.S.G. sec. 3B1.1, cmt. (n.4). Accordingly, an individual who may be criminally liable as an "owner or operator" of pollution under the Clean Air Act, is not necessarily subject to the aggravating role adjustment; the "owner or operator" must independently qualify for the

adjustment with conduct that is more culpable and involves a greater "exercise of management responsibility" than is required for mere Clean Air Act liability. Thus, because an owner or operator's criminal liability under the Clean Air Act would not necessarily result in a sentencing adjustment for his or her aggravating role, we reject the defendants' "double counting" challenge and conclude that their sentences were properly enhanced for their respective leadership and supervisory roles in the conspiracy. See also United States v. Lanzotti, Nos. 98-2728, 98-2750, 2000 WL 157484, at *4-5 (7th Cir. Feb. 15, 2000) (rejecting a challenge that the sentencing judge "double counted" when it used the same conduct to establish a conspiracy offense and to justify an obstruction of justice adjustment); Senn, 129 F.3d at 897 (rejecting a double counting challenge to the captain/navigator smuggler adjustment because the "bar on double counting comes into play only if the offense itself necessarily includes the same conduct as the [adjustment]" (emphasis in original)).

C. Conscious or Reckless Risk of Serious Bodily Injury

Under U.S.S.G. sec. 3D1.2, the sentencing judge grouped the Clean Air Act and Social Security Act offenses because they arose from acts that were closely related as "one whole crime" and involved the same victims (the homeless workers). Hence, pursuant to sec. 3D1.3(a), the court sentenced each defendant under the higher Clean Air Act offense levels. Because the trial court sentenced the defendants under the Clean Air Act offense levels, "the conscious or reckless risk of serious bodily injury" adjustments to the defendants' Social Security Act offense levels were not used to calculate their sentences. Accordingly, in light of our above conclusion that the defendants were properly sentenced under their respective Clean Air Act resulting offense levels, there is no need to address their challenge to the Social Security Act offense adjustments because it could not possibly affect their sentences. See e.g., United States v. Howard, 179 F.3d 539, 545 (7th Cir. 1999); United States v. Dillon, 905 F.2d 1034, 1037-38 (7th Cir. 1990).

CONCLUSION

We hold that the district court did not commit clear error when it enhanced the defendants' offense levels based upon vulnerable victims. We also conclude that the sentencing judge properly enhanced the respective defendants' sentences for their aggravating roles in the crime and correctly calculated their resulting offense

levels. The defendants' sentences are AFFIRMED.

/1 Count one charged the defendants with engaging in a dual-object conspiracy to: (1) knowingly remove asbestos in violation of the Clean Air Act; and (2) fraudulently use social security account numbers to obtain false identification cards for asbestos workers in violation of the Social Security Act. Counts two and three charged Defendants with substantive violations of the Clean Air Act. Counts four through sixteen consisted of thirteen substantive counts concerning the fraudulent use of social security numbers.

/2 The United States filed a motion under Federal Rule of Criminal Procedure 35(b) to reduce Gaines's sentence based on his "substantial assistance" in an unrelated criminal proceeding. On April 7, 1999, the judge resentenced Gaines to 23 months' imprisonment.

/3 The Community Kitchen is a church-run nondenominational "day" shelter, "dedicated to the prevention, education, and intervention of homelessness and hunger." Among other things, the Community Kitchen provides meals, clothing, showers, referrals to overnight shelters, literacy training, job postings and health care for the needy in the Chattanooga area. Included in its health care services, the Community Kitchen also provides treatment for substance abuse and mental health problems.

/4 It appears from the record that the workers were required to study written course material. For reasons unexplained, even though some of the men could neither read nor write, they too passed the course and were considered qualified to participate in the removal of asbestos from buildings and homes.

/5 The Wisconsin Department of Health and Family Services issued the supervisor identification cards to the names and social security numbers referred to on the Memphis supervisor training course certificates. Thus, the defendants instructed the workers to memorize and assume the names and social security numbers indicated on the training certificates and their ID cards in case they were confronted on the job site.

/6 "Regulated asbestos-containing material" includes any material containing more than one percent of asbestos that is "friable," that is, "when dry, can be crumbled, pulverized, or reduced to powder by hand pressure."

/7 The regulations apply to demolition or renovation operations that involve at least 260 linear feet or 160 square feet of "regulated asbestos-containing material."

/8 See generally 40 C.F.R. sec. 61.140, et seq.

/9 See generally 29 C.F.R. sec.sec. 1910.1001, 1926.1101; 59 Fed. Reg. 40964 (1994).

/10 A glove bag is "a 60 x 60 inch impervious plastic bag-like enclosure affixed around an asbestos-containing material, with glove-like appendages through which material and tools may be handled." During glove bagging, a small water bottle is typically inserted and sealed inside the glove bag to moisten the asbestos prior to removal, as is done, for example, when removing the asbestos insulation covering a hot water pipe.

/11 A "negative pressure enclosure" is made of impermeable plastic that seals off the outside air around the area where workers are removing asbestos insulation. The enclosure can be of any configuration, but must have less air pressure than outside, as well as a high efficiency air filter ("HEPA" filter) that removes any asbestos particles from the air.

/12 In fact, according to Gaines, water was largely unavailable to wet down the asbestos, or to wash the asbestos fibers off the workers in the "decontamination" shower enclosures because the water pressure from the six inch water line was too high. The Presentence Investigation Report makes note of the fact that the defendants "did not want to spend the money to reduce the water pressure."

/13 It is unclear from the record whether on this occasion Gaines applied for asbestos supervisor identification cards or worker identification cards.

/14 The sentencing judge, however, sentenced the defendants only under their Clean Air Act crimes because it resulted in a higher offense level for each defendant. See U.S.S.G. sec. 3D1.3(a) (requiring that sentencing be according to the "the highest offense level of the counts in the Group").

/15 A "vulnerable victim" is "a person . . . who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct." U.S.S.G. sec. 3A1.1, cmt. (n.2).

/16 Moreover, in light of the considerable evidence

that demonstrated that the homeless workers had many more problems than just homelessness, including financial, literacy, drug and psychiatric problems, the defendants' claim that some of the workers were not in fact "homeless" is immaterial. The vulnerable victim adjustment does not require any more exacting findings of "unusual vulnerability" than were made here by the sentencing judge. See, e.g., United States v. Grimes, 173 F.3d 634, 637 (7th Cir. 1999) (relying on the inference that only very unsophisticated persons would fall victim to the defendant's fraud scheme in support of a vulnerable victim adjustment).

/17 Under the November 1, 1994 version of the Sentencing Guidelines, "targeting" occurs when a victim who is "unusually vulnerable due to age, physical or mental condition or . . . otherwise particularly susceptible to the criminal conduct," sec. 3A1.1 (Nov. 1994), "is made a target of criminal activity by the defendant." sec. 3A1.1, cmt. (n.1) (Nov. 1994).

/18 A "participant" is defined as another person "who is criminally responsible for the commission of the offense." U.S.S.G. sec. 3B1.1, cmt. (n.1).