In the

# United States Court of Appeals

## For the Seventh Circuit

No. 01-2594

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

GARY ESTERMAN,

*Defendant-Appellant.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 00 CR 319—**Milton I. Shadur**, *Judge.*

ARGUED SEPTEMBER 13, 2002—DECIDED APRIL 2, 2003

Before POSNER, DIANE P. WOOD, and EVANS, *Circuit Judges.*

DIANE P. WOOD, *Circuit Judge.* After he stole money from a Russian business partner, Gary Esterman was tried and convicted on two counts of wire fraud, one count of transacting in criminally derived property, and four counts of money laundering. The district court sentenced Esterman to concurrent terms of 57 months on each count and ordered him to pay $638,540 in restitution. Before this court, Esterman now challenges various aspects of his conviction and sentence. We find it necessary to address only two of his arguments: first, that his money laundering convictions must be vacated because he did nothing to conceal the source of the ill-gotten funds; and second, that the district

court erred in finding that his Russian business partner was a "vulnerable victim" within the meaning of the Sentencing Guidelines because of his limited command of English. We find merit in both these points, and thus we must return the case to the district court for further proceedings.

**I**

In February 1995, Esterman and Igor Sivokozov walked into the Edens Bank in Skokie, Illinois, and opened a joint bank account ("Edens account"). Sivokozov, a Russian businessman and owner of Alfa, Ltd., had recently concluded an agreement with a U.S. company to construct a plant in Volvograd, Russia, for the production of intravenous solutions. The Edens account was to aid in the financing of the project by facilitating so-called mutual payments between parties in the United States and Russia. Under the mutual payments system, payments owed by debtors outside Russia to Russian creditors are matched up with payments owed by Russian debtors to foreign creditors; the result is to avoid or minimize the need for foreign currency. (At trial, Esterman challenged Sivokozov's account of the underlying business deals, but it is not important for our purposes to resolve who was telling the truth.)

What is relevant is that in April 1995, shortly after Sivokozov returned to Russia, a significant amount of money flowed into the Edens account, apparently through mutual payments. First came a cash deposit of $20,000, followed by two transfers of $300,000 and $18,565. Soon thereafter, Sivokozov, Esterman, and some others arranged for a third transfer of $299,975. On April 18, 1995, Sivokozov tried to check on the status of this third transfer, but he was unable to reach Esterman by telephone. With the help of an interpreter, he then placed a direct call to the Edens Bank. Bad news awaited him. He was told that the

third transfer had not yet occurred and also that the funds from the previous transfers had been withdrawn. A few days later, Sivokozov finally reached Esterman by telephone. Esterman initially denied making the withdrawals, but then he confessed that he had done so and offered to explain his actions if Sivokozov could meet him in New York City.

Sivokozov then took matters into his own hands. He dispatched to the United States his "deputy," Andrei Skorikov (Vice President of Sivokozov's company, Alfa), to intercept the last transfer. Skorikov brought with him two checks signed by Sivokozov, presumably so that he could withdraw whatever funds remained in the Edens account. Skorikov may have been trying to work fast, but Esterman was faster. Upon arriving in Skokie, Skorikov found that the third transfer had already landed in the Edens account and been withdrawn by Esterman.

At this point, Skorikov's mission expanded considerably. Having failed to intercept the transfer, Skorikov sought out Esterman. The two met at a Chicago hotel and spoke by telephone on at least four other occasions. Skorikov surreptitiously recorded all of these conversations. In them, Esterman admitted that he had withdrawn the funds from the Edens account, but he promised to replenish the account. In keeping with this representation, in May 1995 Esterman signed a promissory note for the nearly $650,000 that he had taken. In the meantime, it appears from the record that Skorikov may also have engaged in at least two different conversations, one in Chicago and the other in Minsk, about the possibility of taking out a contract on Esterman's life. Despite Esterman's promise to pay back the funds, he had taken no steps in this direction by September. Out of options, and apparently unwilling to take more drastic steps, Sivokozov filed a complaint with the Skokie police and initiated this case.

The ensuing investigation produced evidence that Esterman had withdrawn the funds from the Edens account and transferred them to his G.E. International Account ("G.E. account") at the Michigan Avenue National Bank in at least 33 separate transactions, including wire transfers and withdrawals. A separate wire transfer went to an account at the Chemical Bank in New York. Esterman spent the funds transferred to the G.E. account either by withdrawing cash or by writing checks. One such check for $36,620 went to a local pawn broker. A second check in the amount of $4,064.65 represented a down payment on a Mercedes for Alex Nersessov, another of Esterman's business partners. Two more checks for $5,000 and $3,500 went to Nersessov directly.

On April 20, 2000, a grand jury returned a seven-count indictment against Esterman, including two counts of wire fraud in violation of 18 U.S.C. § 1343, one count of engaging in a monetary transaction in criminally deprived property in violation of 18 U.S.C. § 1957(a), and four counts of money laundering in violation of 18 U.S.C. § 1956(a)(1)(B)(i). Esterman was tried before a jury and was found guilty on all seven counts. Esterman's defense strategy took several tacks. First, his lawyer attempted to cross-examine Skorikov on the conversations about murder-for-hire, but the court cut off that line of questioning. Second, in a postconviction motion, Esterman claimed that he could not have swindled Sivokozov because the money he took did not belong to Sivokozov in the first place and, moreover, Sivokozov was lying when he said there was an intravenous solutions factory and a mutual payments arrangement. The district court denied the motion, largely because Esterman failed to spell out these assertions in sufficient detail. It sentenced him to concurrent terms of 57 months' imprisonment and ordered him to pay $638,540 in restitution.

On appeal, Esterman raises four issues. First, he claims that his money laundering convictions cannot stand because

the government failed to prove the necessary intent to conceal the source of the illegally obtained funds, as required under 18 U.S.C. § 1956(a)(1)(B)(i). Next, Esterman argues that the district court erred by finding that Sivokozov, whose command of English was limited, was a vulnerable victim within the meaning of § 3A1.1(b) of the Sentencing Guidelines. Third, Esterman claims that the district court erred in imposing an enhanced sentence for obstruction of justice under U.S.S.G. § 3C1.1. Last, he asserts that his Sixth Amendment right to confrontation was violated by the district court's order precluding his cross-examination of Skorikov on the murder-for-hire conversations. Because we find that the last two claims lack merit (there was no clear error in the court's finding that Esterman's lies to the probation officer about his assets amounted to obstruction, nor did the court abuse its discretion in restricting the cross-examination), our discussion is limited to Esterman's attacks on the money laundering convictions and the vulnerable victim adjustment.

## II

We turn first to Esterman's challenge to the sufficiency of the evidence against him on the four money laundering counts. To convict under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that the defendant conducted a financial transaction knowing that the property involved in the transaction was illegally derived and knowing that the transaction was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds. *United States v. Gabel*, 85 F.3d 1217, 1223 (7th Cir. 1996). The statute itself states:

> (a)(1) Whoever, knowing that the property involved in a financial transaction represents the proceeds of some form of unlawful activity, conducts or attempts to con-

duct such a financial transaction which in fact involves the proceeds of specified unlawful activity—

(A)(i) with the intent to promote the carrying on of specified unlawful activity; or

(ii) with intent to engage in conduct constituting a violation of section 7201 or 7206 of the Internal Revenue Code; or

(B) knowing that the transaction is designed in whole or in part—

(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity; or

(ii) to avoid a transaction reporting requirement under State or Federal law,

shall be sentenced to a fine of not more than $500,000 or twice the value of the property involved in the transaction, whichever is greater, or imprisonment for not more than twenty years, or both.

18 U.S.C. § 1956(a)(1)(B)(i).

Esterman's core claim is that the government did not prove that he attempted "to conceal or disguise" the stolen funds, because he merely transferred the funds to a separate account and then spent them in an "open and notorious" way. As a result, Esterman claims, his conduct did not amount to the kind of concealment necessary for a money laundering conviction under subpart (B)(i) of the statute. That subpart calls for another transaction—not the original unlawful activity—that is designed in whole or in part to "conceal or disguise" what is happening to the original proceeds. Other forms of money laundering, such as the version captured by § 1956(a)(1)(A)(i), do not have that "conceal or disguise" element. But subpart (B)(i) does, and it is precisely that concealment that Esterman claims is lacking.

Before we can reach the merits of his argument, we must address the question of the applicable standard of review. Esterman makes a stab at convincing us that he alerted the district court to the argument he is now making, and thus should prevail unless any error was harmless. But we agree with the government that he did not do so, and thus we can reverse only if any error was "plain" within the meaning of FED. R. CRIM. P. 52(b). (Esterman's motions to the district court asserted that the alleged factory construction that precipitated the opening of the joint bank account was "a sham" and the alleged mutual payments "a farce." That is simply not the same point he is making here.) He can prevail on his forfeited argument only if he meets the four criteria for proving plain error: an (1) error, (2) that is plain, (3) that affects substantial rights, and (in some ways most importantly) (4) that seriously affects the fairness, integrity, or public reputation of judicial proceedings. See *United States v. Olano*, 507 U.S. 725, 732 (1993); *United States v. Ross*, 77 F.3d 1525, 1538 (7th Cir. 1996).

Subpart (B)(i)'s insistence on proof of concealment or disguise is consistent with the general purpose of the statute. Enacted as part of a crackdown on organized crime and drug trafficking, the Money Laundering Control Act of 1986 was meant to target the transformation of funds derived from illegal activities into a "clean" or useable form. *United States v. Koller*, 956 F.2d 1408, 1411 (7th Cir. 1992). As one article described it, money laundering is typically effectuated

> through a three-step process: (1) the criminally derived money is "placed" into a legitimate enterprise; (2) the funds are "layered" through various transactions to obscure the original source; and (3) the newly laundered funds are integrated into the legitimate financial world in the form of bank notes, loans, letters of credit, or other recognizable financial instruments.

See *Money Laundering*, 39 AM. CRIM. L. REV. 839, 840 (2002) (citations omitted). In its classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business, such as a restaurant or a concert ticket service (two common destinations). The variations, however, are endless, and it can be difficult to categorize transactions that deviate from the paradigm. This is particularly true where a defendant merely transfers the money into a separate account and then makes a number of retail purchases or payments to others.

We have struggled in the past to define precisely what amount of concealment must occur before mere use of ill-gotten gains becomes money laundering prohibited by subpart (B)(i) of the statute. At least two broad principles have emerged. First, we have tried to maintain some separation between the initial transaction from which illegal proceeds were derived and further transactions designed to conceal the source of those proceeds. See *United States v. Scialabba,* 282 F.3d 475, 476-78 (7th Cir. 2002); see also *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001) (noting that "[t]he transaction or transactions that created the criminally-derived proceeds must be distinct from the money-laundering transaction"); *United States v. Mankarious*, 151 F.3d 694, 705 (7th Cir. 1998) ("[M]oney laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds."). Second, we have stressed that the mere transfer and spending of funds is not enough to sweep conduct within the money laundering statute; instead, subsequent transactions must be specifically designed "to hide the provenance of the funds involved." *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir. 1991).

The application of these principles to particular cases, however, has not always been as clear as it might have been. In *United States v. Trost*, 152 F.3d 715 (7th Cir. 1998), for example, a renegade county clerk diverted checks

relating to public business into a "special account" made available by the bank to public officers and then moved funds from the special account to various personal accounts. We found this scheme sufficient to meet the elements of money laundering, reasoning that the "special account" was unknown to the county (and thus created the necessary separation), and also that the bank was deceived into thinking that the account was used for legitimate public purposes (and thus achieved the concealment purpose). *Id*. at 720.

Similarly, in *United States v. Reynolds*, 64 F.3d 292 (7th Cir. 1995), a local district president of a union set up a scheme to siphon off dues paid by union members. First, he diverted funds from the union's accounts into a personal account, and then he altered the union's financial records to understate the amount of dues collected. The defendant Reynolds claimed that the necessary concealment element was missing from this scheme, but this court disagreed. Rather than relying on the alteration of the financial records, we focused instead on the fact that the defendant "used the [personal] account to conceal or disguise the proceeds," which we found was enough to satisfy § 1956(a)(1)(B)(i). *Id*. at 297-98.

It is true that in both these cases the alleged concealment overlapped substantially with the underlying fraud. Nevertheless, we are satisfied that neither *Trost* nor *Reynolds* is inconsistent with the general rule reflected in our cases to the effect that both distinct transactions and deliberate concealment must be shown to support a money laundering conviction. The *Trost* court was evidently satisfied that the defendant's use of multiple personal accounts in those circumstances was enough to show the necessary concealment. Likewise, the *Reynolds* court saw the falsification of union books as the required additional concealment beyond the initial diversion of union dues proceeds.

We find the analysis in *Hollenback v. United States*, 987 F.2d 1272 (7th Cir. 1993), to be useful for present purposes. In that case, the defendant crafted an elaborate mortgage scheme, including multiple irregular transfers calculated to avoid reporting requirements, in an attempt to conceal the drug-related origins of the funds. *Id*. at 1279. This showed the requisite intent to conceal or disguise. We distinguished these elaborate concealment efforts with the relative absence of comparable measures in *United States v. Sanders*, 929 F.2d 1466 (10th Cir. 1991). In *Sanders*, the Tenth Circuit held that defendant's purchase of two cars from a salesperson, done without any effort to disguise his identity, and his subsequent conspicuous use of both cars, was inconsistent with a finding of concealment. *Id*. at 1472.

A comparison of all these prior cases to Esterman's leads to the conclusion that the government's proof here fell short. Like the defendant in *Sanders,* Esterman made no effort to disguise or conceal either his withdrawals from the Edens account or the destinations of the funds. There was nothing complicated about his disposition of the funds: to the contrary, he simply made deposits into other bank accounts that were correctly identified and he engaged in some retail transactions. By contrast, Hollenback employed highly irregular transfers that were calculated to evade detection. Because the latter element is lacking in Esterman's transactions, we conclude that the convictions for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) cannot stand.

We do so notwithstanding several arguments the government has offered to save the convictions. In its view, Esterman's actions after the transfer of funds from the Edens account to the G.E. account were "more than simple retail purchases." But the record does not bear out this assertion. Two of the four checks drawn from the G.E. account and entered into evidence at trial were made out to a pawn shop and a car dealership. There is nothing to

suggest that these are anything but retail purchases. The other two checks, which were made payable directly to a business partner, similarly did not conceal anything.

Moving on, the government finds it significant that Sivokozov was unaware of the G.E. account. This lack of awareness, it urges, establishes an intent to conceal on Esterman's part. But this is just another way of describing Esterman's initial fraudulent scheme, whereby he took the money away from Sivokozov. Most fraud victims probably assume that their money has either been spent or placed in an account *of some sort*, even if they do not know the specific destination of the funds. If that were enough to show money laundering at the same time, there would be no distinction left between money laundering and the underlying fraud, and individuals who perpetrate simple fraud by transferring ill-gotten funds into a personal account would always be triable as money launderers.

Finally, the government suggests that Esterman's intent to conceal can be proven by his use of the transferred funds to write checks payable to other persons in ways that were not easily "traceable" to the Edens account. This ignores the fact that prosecutors easily traced Esterman's transfers from one account to the other. Once again, Esterman's transfer does not resemble classic money laundering because of the absence of efforts to transform ill-gotten funds into apparently innocent assets or funds that the criminal can use later with impunity. Other than the fact that Esterman had some control over both the Edens account and the G.E. account, there was no connection between the two accounts. Our adoption of the government's line of reasoning would once again convert any fraud involving transfer of money between unrelated accounts into money laundering.

Many courts have recognized the importance of maintaining a distinction between these grounds of criminal liability.

These decisions spell out the point that something more than mere transfer and spending is needed for money laundering, even if that "something more" is hard to articulate. Cases concluding that the line has been crossed into the "money laundering" territory include *United States v. Thayer*, 204 F.3d 1352, 1354-55 (11th Cir. 2000) (funneling illegal funds through various fictitious business accounts); *United States v. Majors*, 196 F.3d 1206, 1212-13 (11th Cir. 1999) ("elaborate shell game" involving multiple inter-company transfers with a variety of signatory names); *United States v. Willey*, 57 F.3d 1374, 1387 (5th Cir. 1995) ("highly unusual" transactions involving cashier's checks, third party deposits, and trust accounts used to disguise source of funds); *United States v. Garcia-Emanuel*, 14 F.3d 1469, 1476-79 (10th Cir. 1994) (land purchased in name of restaurant to make it appear that business was source of wealth and truck purchased in wife's name for stated purpose of deceiving IRS); *United States v. Campbell*, 977 F.2d 854, 858 n.4 (4th Cir. 1992) (reduction in price for sale of house combined with under-the-table payment); *United States v. Beddow*, 957 F.2d 1330, 1334-35 (6th Cir. 1992) (use of "front man" and "convoluted financial dealings" to invest in emeralds and a charter boat, designed to disguise ownership and evade transaction reporting requirements); *United States v. Lovett*, 964 F.2d 1029, 1033-37 (10th Cir. 1992) (convoluted financial transactions leading up to purchase of house, combined with misleading statements regarding nature and source of purchase money). These cases have in common the existence of more than one transaction, coupled with either direct evidence of intent to conceal or sufficiently complex transactions that such an intent could be inferred. In contrast, the cases in which money laundering charges have not succeeded are typically simple transactions that can be followed with relative ease, or transactions that involve nothing but the initial crime. See, *e.g., United States v. Olaniyi-Oke*, 199 F.3d 767, 770-71 (5th Cir. 1999) (fraudulent use of another's name and credit

card to make a purchase is not enough to satisfy the concealment prong); *United States v. Rockelman*, 49 F.3d 418, 422 (8th Cir. 1995) (purchase of cabin with cash and placement of title to property in name of company defendant owned). In sum, it is important, even if difficult at times, to ensure that the money laundering statute not turn into a "money spending statute." *Sanders*, 929 F.2d at 1472.

We conclude that a conviction for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) is valid only where there is concrete evidence of intent to disguise or conceal transactions, whether that evidence comes directly from statements by the defendant that indicate an intent to conceal, or from circumstantial evidence like unusual secrecy surrounding transactions, careful structuring of transactions to avoid attention, folding or otherwise depositing illegal profits into the bank account or receipts of a legitimate business, use of third parties to conceal the real owner, or engaging in unusual financial moves culminating in a transaction. See *Garcia-Emanuel*, 14 F.3d at 1475-76 (listing examples). The government proved none of these points at trial. To convict Esterman on these charges would, in our view, be error. That error is plain on this record. Convictions on four additional counts affect Esterman's substantial rights, and, in light of the importance of maintaining the distinction between money laundering and other related crimes, we believe that the error here affects the fairness, integrity, and reputation of the proceedings. We therefore conclude that Esterman is entitled to have his convictions on the money laundering counts vacated, and to have the case remanded so that the district court can revise his sentence accordingly.

## III

Esterman also claims that the district court erred when it found that Sivokozov's limited command of English

rendered him a vulnerable victim within the meaning of U.S.S.G. § 3A1.1(b)(1). Section 3A1.1(b) allows a district court to impose a two-level enhancement where the defendant knew or should have known that the victim was vulnerable. See U.S.S.G. § 3A1.1, App. Note 2 (1995). The Guidelines define a vulnerable victim as an individual

> (A) who is a victim of the offense of conviction and any conduct for which the defendant is accountable under § 1B1.3 (Relevant Conduct); and (B) who is unusually vulnerable due to age, physical or mental condition, or who is otherwise particularly susceptible to the criminal conduct.

*Id.*

Esterman first argues that the district court applied the wrong legal standard by looking only at Sivokozov's linguistic abilities, to the exclusion of other factors. This, Esterman argues, amounts to an inappropriate *per se* rule and requires that we review *de novo* the district court's application of the enhancement. We disagree. It is possible, in appropriate circumstances, to rely on a single factor in imposing this enhancement. Whether one or more factors are used, we review the district court's enhancement determination for clear error. *United States v. Purchess*, 107 F.3d 1261, 1265 (7th Cir. 1997).

On the merits, the inquiry boils down to one central question: did the district court commit clear error in determining that Sivokozov was particularly susceptible to the criminal conduct and thus had a lower than normal ability to protect himself? Here again, Esterman contends that the district court erred by looking only at Sivokozov's limited command of English, to the exclusion of the factors that tend to show that he did not fall within the group the Guideline is designed to protect—factors like Sivokozov's sophistication as a businessperson, his ability to communicate with the bank through an interpreter, his ability to

dispatch deputies, and his familiarity with the legal system as evidenced by his filing of criminal and civil complaints against Esterman. This time, we agree that on this record the court committed clear error by considering the linguistic factor in isolation.

We further agree with Esterman that the facts to which he points tend to negate a finding of vulnerability. The record makes clear that Sivokozov, upon learning that Esterman was siphoning funds from the Edens account, had no trouble promptly dispatching a deputy and exploring a variety of self-help options for a full three months before turning to the police and the courts. Moreover, his access to an interpreter eliminated most, if not all, of the effects of the language barrier. Finally, vulnerable victims do not have henchmen at their beck and call; they do not persuade those who have defrauded them to sign promissory notes; nor do they float the possibility of contract-killings with third parties, and then file police and civil complaints when payments on the note are not made.

None of our earlier decisions relating to language as a marker of vulnerability is particularly helpful. Illiteracy was at issue in *United States v. Bragg*, 207 F.3d 394 (7th Cir. 2000), in which we upheld an enhancement where defendants fraudulently used the social security account numbers of (mostly) illiterate homeless men to obtain false identification cards for asbestos workers in violation of the Social Security Act. *Id*. at 399-400. But it is obviously one thing to be illiterate and another to be a sophisticated businessperson who simply speaks a different language and has access to English-speaking agents and interpreters. Our decision in *United States v. Parolin*, 239 F.3d 922 (7th Cir. 2001), is also distinguishable, because the vulnerable victims there not only were unable to speak English, but they also were financially unsophisticated and thus were less able than the average person to detect and question a fraudulent scheme. *Id*. at 926-27. That does not describe

Sivokozov. Decisions from other circuits rely on many of these same distinctions. See *United States v. Bonetti*, 277 F.3d 441, 450 (4th Cir. 2001); *United States v. Mendoza*, 262 F.3d 957, 960 (9th Cir. 2001); *United States v. Medrano*, 241 F.3d 740, 744-45 (9th Cir. 2001).

We conclude that the district court committed clear error in relying solely on Sivokozov's limited ability in English to conclude that he was a vulnerable victim for purposes of U.S.S.G. § 3A1.1(b)(1). Esterman's sentence must therefore be recalculated without taking that enhancement into account.

### IV

In summary, we VACATE Esterman's convictions on Counts 4 through 7 of the indictment, representing the charges under 18 U.S.C. § 1956(a)(1)(B)(i). We also hold that the vulnerable victim adjustment of U.S.S.G. § 3A1.1(b)(1) does not apply on these facts. We REMAND the case to the district court for further proceedings consistent with this opinion.

A true Copy:

　　　　Teste:

　　　　　　　　　　＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿＿
　　　　　　　　　　*Clerk of the United States Court of*
　　　　　　　　　　*Appeals for the Seventh Circuit*