NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued January 24, 2017
Decided February 16, 2017

**Before**

WILLIAM J. BAUER, *Circuit Judge*

FRANK H. EASTERBROOK, *Circuit Judge*

MICHAEL S. KANNE, *Circuit Judge*

No. 16-2755

| | |
|---|---|
| UNITED STATES OF AMERICA, *Plaintiff-Appellee,* | Appeal from the United States District Court for the Central District of Illinois. |
| *v.* | No. 14-cr-40053-002 |
| GIANCO F. SHERIDAN, a/k/a GEO *Defendant-Appellant*. | Sara Darrow, *Judge*. |

**O R D E R**

Gianco Sheridan was convicted after a jury trial of money laundering and conspiring to commit that offense. His cousin was dealing marijuana and, at Sheridan's urging, had directed a repeat customer to make payments by depositing currency into Sheridan's bank accounts for the cousin's benefit. Sheridan argues that the government did not introduce sufficient evidence to prove that (1) he intended to conceal the transactions, (2) the deposits represented drug proceeds, (3) he knew the deposits were

proceeds of unlawful activity, or (4) the conspiracy's purpose was to launder money. To the contrary, the evidence on these points is overwhelming.

Sheridan and his cousin, Quisontro Hart, lived in California. Hart supplied marijuana to Joel McCalebb in Rock Island, Illinois. Hart would mail to McCalebb packages of marijuana weighing 1 to 2 pounds, each costing $4,000 to $4,800. In turn McCalebb would mail currency to Hart or deposit currency in designated bank accounts, four of them Sheridan's.

Sheridan was charged with 32 substantive counts of money laundering, each corresponding to a deposit that McCalebb had made, *see* 18 U.S.C. § 1956(a)(1)(B)(i), and conspiring to launder drug proceeds, *id.* § 1956(h). Hart, who pleaded guilty to conspiracy to distribute marijuana, testified at Sheridan's trial that initially McCalebb was making payments into his Chase account or the Wells Fargo account of Justin Gregle, Hart's friend. Hart explained that he wanted McCalebb's payments split between two accounts "so no one account would look like it was overly used at a time." But Chase became suspicious anyway and closed Hart's account in the summer of 2013, and Hart never opened another. Soon after, Sheridan moved in with Hart's mother, then Hart, and finally with a friend of Hart (all three in Los Angeles). Hart also used that friend's apartment to package marijuana. Sheridan learned about Hart's arrangement with Gregle and mentioned that he also had a Wells Fargo account. In exchange for allowing McCalebb to make deposits into Sheridan's account, Hart paid Sheridan a small percentage of each deposit and also gave him marijuana.

Hart and Sheridan reached a "mutual understanding" that Hart's name could not be associated with the bank accounts, and over the next year Sheridan opened several more, beginning with a personal account at Bank of America. Sheridan also opened an account at U.S. Bank in the name of a phony business, "Soles & Photos," after McCalebb told Sheridan and Hart how to get a business license. But after just a week the bank closed that account for suspicious activity. Sheridan then opened another account at Bank of America under "Soles & Photos." Hart testified that Sheridan opened the business accounts "because of what we were doing with the marijuana."

Hart did not permit Sheridan to communicate with McCalebb; McCalebb would text Hart from the Midwest after depositing currency into a branch of Wells Fargo, U.S. Bank, or Bank of America, then Hart would text Sheridan to confirm his receipt of the money in his account. After that Sheridan withdrew the money from branches in California, retaining only his percentage.

Hart told the jury that after Chase had closed his account in 2013 he didn't open another bank account in his name to be used for McCalebb's payments. "I didn't want to get in trouble," he explained, "plus my name was kind of hot with the DEA" because of a similar drug operation in Alaska. The plan, he said, was "for McCalebb and I to stay off the radar as much as possible and, therefore, we'll have longer success in shipping and receiving marijuana." Jon Johnson, a sheriff's deputy with prior federal experience as an agent with the DEA and IRS Criminal Investigation Division, testified that he had reviewed records from Sheridan's bank accounts and then identified each charged deposit and corresponding withdrawal.

Sheridan moved for a judgment of acquittal at the close of evidence, arguing that the government had not presented sufficient evidence to support a conviction on any count. The district court denied his motion. Sheridan's attorney conceded in closing that the government had proved he conducted financial transactions "in abundance" but contested the other elements of money laundering and the underlying conspiracy.

The jury found Sheridan guilty on all counts. He moved for a new trial, contesting the sufficiency of the evidence, which the court denied. Sheridan was sentenced to 33 months' imprisonment on each count, to run concurrently.

For all of the counts, Sheridan again concedes on appeal that the government proved he conducted financial transactions but contests the remaining elements: that he knew those transactions were designed "to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity"; that in fact the funds were proceeds of specified unlawful activity; and that he knew the funds were proceeds of some form of unlawful activity, *see* 18 U.S.C. § 1956(a)(1)(B)(i); *United States v. Turner*, 400 F.3d 491, 496 (7th Cir. 2005).

Sheridan's main argument is that McCalebb's deposits and his own withdrawals did not violate § 1956(a)(1) because, Sheridan says, "the evidence presented by the Government at trial demonstrated that Sheridan did not 'conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds' where he performed simple banking transactions under his own account number, openly and notoriously." Instead, Sheridan says, he "merely facilitated the transfer of funds between McCalebb and Hart." Sheridan argues that he openly banked under his own name, used the money remaining in his account (his fee) only for personal transactions, and did not "clean" the money before giving it to Hart.

But the "concealment" element, *see* 18 U.S.C. § 1956(a)(1)(B)(i), actually requires that the defendant *know the financial transaction was designed to conceal*, not that it

succesfully conceal. *Turner*, 400 F.3d at 496; *United States v. Esterman*, 324 F.3d 565, 573 (7th Cir. 2003) (concluding that conviction under § 1956 requires proof of "intent to disguise or conceal transactions"). Sheridan cites no authority for the proposition that a poor design to conceal—which is essentially all that he asserts here—is a defense under § 1956. And in this case the government presented ample evidence for a rational jury to infer that Sheridan had allowed his preexisting Wells Fargo account, and specifically opened new accounts at two other banks, to be used to conceal the money's relationship to Hart and McCalebb.

Using a third party to disguise the real owner of funds is evidence of intent to conceal. *Esterman*, 324 F.3d at 573. Sheridan's argument that he banked under his own name is not only misleading (two of the accounts were opened in the name of a phony business) but also beside the point, since the money moving through Sheridan's accounts belonged to Hart, not Sheridan. Hart testified that the deposits were made to Sheridan's account because he and McCalebb wanted to "stay off the radar." Given that evidence, as well as the number of bank accounts that Sheridan opened and the fact that he used them only for Hart's benefit, it's inescapable that the charged financial transactions—the deposits of Hart's money by McCalebb—were designed to conceal *Hart's* ownership and control of the money. *See, e.g., United States v. Baldridge*, 559 F.3d 1126, 1141 (10th Cir. 2009) (explaining that intent to conceal ownership of funds can be inferred from use of third party, with whom defendant has close relationship, to transfer funds); *United States v. Shepard*, 396 F.3d 1116, 1122 (10th Cir. 2005) (concluding that intent to conceal could be inferred from defendant's deposit of illicit proceeds into daughter's account); *United States v. Bowman*, 235 F.3d 1113, 1116 (8th Cir. 2000) (depositing cash from robberies into girlfriend's account showed intent to conceal). Additionally, a rational jury could conclude that the transactions were designed to conceal the fact that McCalebb was depositing drug proceeds in Sheridan's accounts. *See United States v. Hall*, 434 F.3d 42, 50–51 (1st Cir. 2006) (noting that § 1956 criminalizes transactions that conceal the source of drug proceeds "even if the defendant does not conceal his own identity in the process").

Sheridan next argues that the government did not prove the currency deposited into his accounts came from specified unlawful activity, i.e., illegal drug sales, because only McCalebb could rule out the possibility that he deposited money from a legal source—and he didn't testify. But Johnson, the sheriff's deputy who summarized the financial transactions, testified that all of McCalebb's deposits were currency. The jury knew that McCalebb was selling marijuana; thus, it rationally could conclude that McCalebb had generated currency from drug sales and was depositing that currency into Sheridan's accounts. McCalebb had no other reason to put money into Sheridan's

accounts. *See United States v. Smith*, 223 F.3d 554, 577 (7th Cir. 2000) (explaining that jury could infer that drug dealer's cash payments had come from drug sales).

Sheridan then argues that the government did not prove he knew the money came from unlawful activity, because Hart controlled all communication with McCalebb. But the government presented enough evidence for a rational jury to infer that Sheridan knew drug money was deposited in his account. *See, e.g., United States v. McBride*, 724 F.3d 754, 757 (7th Cir. 2013) (concluding that judge at bench trial could find that defendant's girlfriend knew he was dealing drugs and thus that money she deposited for him had come from drug sales rather than business which, she also knew, generated insubstantial income). Hart testified that, when he introduced his operation to Sheridan, he said that Gregle was "a guy who I use to get payment from McCalebb." Hart also testified that Sheridan purchased packing supplies, helped package and mail drugs, and lived in the apartment where Hart prepared shipments. That was enough information for a rational jury to infer that Sheridan knew Hart was mailing drugs to a dealer in Illinois who would then deposit drug proceeds in Sheridan's account.

Finally, Sheridan contests his conviction for conspiracy to launder drug proceeds, arguing that the government did not prove that the purpose of the conspiracy was to launder money. But Hart testified that Sheridan joined the conspiracy because he wanted to make money by letting Hart use his Wells Fargo bank account. Sheridan gave his account information to Hart based on a "mutual understanding" that Hart couldn't use a bank account in his own name because the DEA knew about Hart from a similar drug enterprise in Alaska. And Hart explained that Sheridan had opened new accounts "because of what we were doing with the marijuana." Based on that evidence, a rational jury readily could conclude that Sheridan joined McCalebb and Hart to "clean" their money.

AFFIRMED.