# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued October 12, 2007      Decided December 18, 2007
                      Amended February 15, 2008

No. 04-3080

UNITED STATES OF AMERICA,
APPELLEE

v.

SUNDAY YEMI ADEFEHINTI,
APPELLANT

———

Consolidated with
05-3046, 05-3055

———

Appeals from the United States District Court
for the District of Columbia
(No. 01cr00451-01)
(No. 01cr00451-02)
(No. 01cr00451-04)

———

*Charles B. Wayne*, appointed by the court, argued the cause and filed the brief for appellant Sunday Yemi Adefehinti.

*Sandra G. Roland*, Assistant Federal Public Defender, argued the cause for appellant Tayo John Bode. With her on the briefs was *A.J. Kramer*, Federal Public Defender. *Neil H. Jaffee* and *Shawn Moore*, Assistant Federal Public Defenders, entered appearances.

*Michael Alan Olshonsky*, appointed by the court, argued the cause and filed the brief for appellant Olushola Akinleye.

*Ellen R. Meltzer,* Attorney, U.S. Department of Justice, argued the cause for appellee. With her on the brief was *Jeffrey A. Taylor*, U.S. Attorney.

Before: GRIFFITH, *Circuit Judge*, and EDWARDS and WILLIAMS, *Senior Circuit Judges*.

Opinion for the Court filed by *Senior Circuit Judge* WILLIAMS.

WILLIAMS, *Senior Circuit Judge*: Five defendants—appellants Adefehinti, Akinleye, and Bode, and two others (Akinkuowo and Protech Builders)—were tried together for a variety of crimes arising out of a scam by which they contrived to secure mortgages on items of real property at vastly inflated values. The three appellants were convicted on counts of racketeering, in violation of 18 U.S.C. § 1962(c); bank fraud, in violation of 18 U.S.C. § 1344; and interstate transportation of stolen property, in violation of 18 U.S.C. § 2314. Adefehinti and Bode were also convicted of money laundering, in violation of 18 U.S.C. § 1956(a)(1)(B)(i). The district court sentenced Adefehinti to 74 months in prison, Akinleye to 37 months, and Bode to 57 months.

Adefehinti, Akinleye, and Bode attack their convictions on multiple grounds. Adefehinti also challenges his sentence. The only claims meriting discussion in a published opinion are (1) Adefehinti's and Bode's contention that the evidence

was insufficient to convict them of intending to conceal funds, an essential element of the money laundering charge, and (2) appellants' claim that the circumstances under which loan documents were admitted into evidence compromised their rights under the Confrontation Clause of the Sixth Amendment. We reverse Adefehinti's and Bode's money laundering convictions but otherwise affirm the judgments in all respects.

\* \* \*

Between 1995 and 1999, defendants defrauded banks of millions of dollars through real estate and mortgage transactions involving properties in Washington, D.C. The scheme consisted of a series of fraudulently executed land "flips": defendants bought cheap properties with fake identities and then sold them to each other for artificially high prices, using bank loans to fund the purchase. Defendants fabricated the identity of buyers, providing the straw buyers with false employment histories, financial records, and addresses. In some cases, the buyers had the names of real individuals, but defendants doctored their employment or financial histories so that they would qualify for more substantial loans; occasionally, defendants would sign the name of a real person without his knowledge. At defendants' behest, appraisers lied about the properties' value, inflating the listing price.

The schemers submitted the fraudulent loan applications to banks, which relied on them in making lending decisions. On the issuance of loan checks to the straw buyers, the defendants distributed the proceeds among themselves. The non-existent or unqualified buyers naturally failed to make mortgage payments, which eventually led the banks to foreclose.

4

Adefehinti, owner of W.H.V. Realty, served as the real estate broker and orchestrated many facets of the scheme. Akinleye owned Protech, a company at which some of the straw buyers falsely claimed to work, and signed a variety of loan documents in other people's names. Bode, a co-owner and officer of Protech, played various roles, helping to fabricate the straw buyers' financial and employment records and facilitating the purchase and sale of properties.

\* \* \*

Bode's and Adefehinti's money laundering convictions under 18 U.S.C. § 1956(a)(1)(B)(i) turned on their roles in allocating the proceeds from the fraudulent sale of a property located at 137 Adams Street, N.W. They argue that the prosecution failed to offer sufficient evidence of a crucial element of such a conviction, namely that they intended to conceal the funds in question. In reality, they say, the transactions amount to no more than divvying up the joint venture's gains, albeit illegally obtained. We agree.

To convict a person for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i), the government must prove that (1) the defendant conducted or attempted to conduct a financial transaction; (2) the transaction involved the proceeds of unlawful activity; (3) the defendant knew that the proceeds were from unlawful activity; and (4) the defendant knew "that the transaction [was] designed in whole or in part—(i) to conceal or disguise the nature, the location, the source, the ownership, or the control of the proceeds of specified unlawful activity." 18 U.S.C. § 1956(a)(1)(B)(i); see also *United States v. Majors*, 196 F.3d 1206, 1212 (11th Cir. 1999). Bode and Adefehinti claim that the government failed to prove the fourth element of the offense, namely that they

attempted to "conceal or disguise" the fraudulently obtained funds.

The basis of the money laundering convictions was the disposition of a settlement check for $41,010, which was payable to "Mohamed Massaqudi," an evidently fictional seller. The lower left-hand corner of the check stated that the check was "for proceeds of settlement of 137 Adams St." See GX 234. The check was endorsed in Massaqudi's name to Bernard Adeola of Image Construction, with a notation of the account number of W.H.V. Realty, Adefehinti's real estate company, and was negotiated at NationsBank. Immediately thereafter, $8000 was deposited into Bode's account at NationsBank, $16,340 into W.H.V. Realty's account there, $8010 into an unrelated account there, and $7000 was received as cash. Adefehinti then wrote checks to Akinkuowo on his W.H.V. Realty account for a total of $7000 (one for $3000 immediately after the transaction, another for $4000 a few days later).

The government contends that a reasonable jury could conclude that these transactions, originating with a check made payable to a fictitious individual, were part of a scheme to conceal the fact that these funds were the proceeds of fraudulently obtained bank loans. As usual, we review the evidence in the light most favorable to the government. *United States v. Carson*, 455 F.3d 336, 368-69 (D.C. Cir. 2006).

The money laundering statute criminalizes behavior that masks the relationship between an individual and his illegally obtained proceeds; it has no application to the transparent division or deposit of those proceeds. "In its classic form, the money launderer folds ill-gotten funds into the receipts of a legitimate business." *United States v. Esterman*, 324 F.3d 565, 570 (7th Cir. 2003). Section 1956, enacted as part of the

Money Laundering Control Act of 1986, punishes those who "inject[] illegal proceeds into the stream of commerce while obfuscating their source." *United States v. Wynn*, 61 F.3d 921, 926 (D.C. Cir. 1995).

It seems clear that, as the Seventh Circuit has observed, the necessary intent to conceal requires "something more" than the mere transfer of unlawfully obtained funds, though that "'something more' is hard to articulate." *Esterman*, 324 F.3d at 572. Rather, "subsequent transactions must be specifically designed to hide the provenance of the funds involved." *United States v. Jackson*, 935 F.2d 832, 843 (7th Cir. 1991). *Esterman* noted that cases in which courts have upheld money laundering convictions "have in common the existence of more than one transaction, coupled with either direct evidence of intent to conceal or sufficiently complex transactions that such an intent could be inferred." 324 F.3d at 572. The court's list of cases that have found laundering is instructive:

> Cases concluding that the line has been crossed into the "money laundering" territory include *United States v. Thayer,* 204 F.3d 1352, 1354-55 (11th Cir. 2000) (funneling illegal funds through various fictitious business accounts); *United States v. Majors,* 196 F.3d 1206, 1212-13 (11th Cir. 1999) ("elaborate shell game" involving multiple inter-company transfers with a variety of signatory names); *United States v. Willey,* 57 F.3d 1374, 1387 (5th Cir. 1995) ("highly unusual" transactions involving cashier's checks, third party deposits, and trust accounts used to disguise source of funds); *United States v. Garcia-Emanuel,* 14 F.3d 1469, 1476-79 (10th Cir. 1994) (land purchased in name of restaurant to make it appear that business was source of wealth and truck purchased in wife's name for stated purpose of deceiving IRS); *United States v. Campbell,* 977 F.2d 854, 858 n.4

(4th Cir. 1992) (reduction in price for sale of house combined with under-the-table payment); *United States v. Beddow,* 957 F.2d 1330, 1334-35 (6th Cir. 1992) (use of "front man" and "convoluted financial dealings" to invest in emeralds and a charter boat, designed to disguise ownership and evade transaction reporting requirements); *United States v. Lovett,* 964 F.2d 1029, 1033-37 (10th Cir. 1992) (convoluted financial transactions leading up to purchase of house, combined with misleading statements regarding nature and source of purchase money).

324 F.3d at 572. At the other end of the spectrum are "typically simple transactions that can be followed with relative ease, or transactions that involve nothing but the initial crime." *Id;* see also *United States v. Olaniyi-Oke*, 199 F.3d 767, 770-71 (5th Cir. 1999).

The transactions in this matter are of the latter sort. A check was negotiated at a bank. A little less than half its proceeds ($16,340) were deposited into Adefehinti's business account. Other than $7000 that was received as cash upon negotiating the check, the rest was divided among Bode's account and another individual's. Other than the two checks totaling $7000 that Adefehinti addressed to Akinkuowo from his W.H.V. Realty account after depositing some of the funds there, all the proceeds of the initial check were either cashed or went directly into accounts in the name of defendants or their associates without passing through any other person's account.

Bode's share was deposited into an account in his own name at the bank he frequents. There is no evidence that Adefehinti or Bode took steps to disguise or conceal the source or destination of the funds. Even assuming the check's original endorsee—Bernard Adeola—was a fictional

character, the funds never entered his account, and the check expressly indicated a link to W.H.V. Realty, a firm that could easily be tied to Adefehinti. We also note that an FBI agent who testified on behalf of the prosecution stated that, in the course of his investigation, he never bothered to track down or even attempt to contact Adeola or look up his company (Image Construction) in Virginia, DC, or Maryland business directories. The irrelevance of Adeola was perhaps so obvious that the agents saw no point in investing time in his pursuit.

An observer who reads the endorsement on the initial check and studies the names and numbers on the subsequent deposit slips and checks could discern the money trail with ease. The record has no suggestion that the prosecutors and law enforcement agents had any difficulty doing so. All the transactions conspicuously lack the "convoluted" character associated with money laundering.

During oral argument, the government maintained that defendants' intent to conceal started (and perhaps ended) with the deception inherent in making checks payable to straw buyers (each of whom, of course, received a check in phase two of the transactions, on reselling to a new straw buyer). But the proposed analysis would conflate the act of fraudulently obtaining money with the act of concealing it— two different activities which rarely are one and the same. See *United States v. Seward*, 272 F.3d 831, 836 (7th Cir. 2001) (emphasizing that the "transaction or transactions that created the criminally-derived proceeds must be distinct from the money-laundering transaction"); *United States v. Mankarious,* 151 F.3d 694, 705 (7th Cir. 1998) ("Money laundering criminalizes a transaction in proceeds, not the transaction that creates the proceeds."). Having carried out a fraud of which concealment was an integral part, defendants cannot be charged with the same concealment a second time,

as if it were the sort of independent manipulation of the proceeds required for money laundering.

Accordingly, Adefehinti's and Bode's convictions for money laundering under 18 U.S.C. § 1956(a)(1)(B)(i) cannot stand.

* * *

Adefehinti (joined by his fellow appellants) argues that the district court violated his rights by admitting into evidence loan documents based on certificates that the records' custodians provided pursuant to Federal Rule of Evidence 902(11). As it appears in the opening brief, the claim appears to have two elements: first, that the custodians making the certificates lacked knowledge of the propositions they certified and that those propositions were altogether unsupported; second, that the assertions in the Rule 902(11) certificates constituted testimonial evidence within the meaning of *Crawford v. Washington*, 541 U.S. 36, 42-56 (2004), so that introduction of the loan documents via those certificates rather than by live testimony violated defendants' rights under the Sixth Amendment's Confrontation Clause.

The disputed materials are hundreds of loan applications, sales contracts, promissory notes, verifications of deposit, verifications of employment and similar documents that, according to the government, the banks relied upon in determining whether to lend money. They were received in evidence on the basis of certificates under Federal Rule of Evidence 902(11), which permits authentication of "certified domestic records of regularly conducted activity" without "[e]xtrinsic evidence of authenticity," provided that the records are admissible under Federal Rule of Evidence 803(6), the business records exception to the hearsay rule, and are

accompanied by a certificate meeting the rule's standards. The certificate must contain "a written declaration of [the record's] custodian or other qualified person . . . , certifying" that the record

> (A) was made at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters; (B) was kept in the course of the regularly conducted activity; and (C) was made by the regularly conducted activity as a regular practice.

Fed. R. Evid. 902(11). The required assertions are, of course, almost exactly the propositions needed for admission of a business record under Rule 803(6).

Here the disputed records were accompanied by certificates with assertions tracking Rule 902(11)'s specifications. In some instances the certifying custodians testified as well. Adefehinti, in his opening brief, alludes to the testimony of several witnesses who had provided such certificates, claiming that their testimony in fact undermines the certificates. Each of the three involves different types of documents: (1) a bank official certified the authenticity of documents that the bank relied upon in making lending decisions; (2) a legal support employee of another bank certified the authenticity of checks, deposit slips, and other documents related to defendants' depositing the proceeds of their ill-gotten gains; and (3) an operations manager of a title company certified the authenticity of certain identifications and documents used at closing. The primary focus of Adefehinti's argument, however, is the first category—loan-supporting documents. Indeed, this is where his argument is strongest, as the way in which the other types of documents were created and used more obviously fits the business

records exception. We limit our discussion, then, to the certifiers of loan-supporting documents.

Frederick Richter, an employee of Standard Federal Bank, certified such documents. He testified that he was familiar with his bank's lending process. He explained that, for each loan, the bank would receive a set of documents from a mortgage broker—documents that the bank would rely on in extending loans and that it would store once a loan was made. We now turn to the specific claims.

*Alleged absence of support for assertions in the Rule 902(11) certificates.* Adefehinti points to Richter's testimony on cross-examination, which he believes shows that Richter (and, by implication, the multiple non-testifying bank officials who certified loan-supporting documents) was plainly not qualified to make the assertions required by Rule 902(11). For example, counsel brought out from Richter that his knowledge of the role of specific documents was not based on familiarity with the specific transaction but rather on knowledge of the bank's processes and relationship with mortgage brokers, and on the fact that the documents were in the bank's files. Apart from that knowledge, and from material in the documents themselves (such as dates and signatures), he had no way of knowing when, how, or by whom a document was initially created, or when it initially came into the bank's possession.

Assuming the non-testifying certifiers had no more knowledge of the documents' creation than did Richter, there are two arguable weaknesses in the factual basis underlying the certificates. First, the certifying officials had no direct knowledge of the circumstances under which the records were made in the sense of being incorporated into the bank's records. Second, the bank certifiers could not competently address the *original* creation of the records; that had occurred

in the course of the mortgage brokers' business. That being so, appellants question whether the certifiers could legitimately assert (as required by the rule) that the records were "*made* at or near the time of the occurrence of the matters set forth by, or from information transmitted by, a person with knowledge of those matters." Fed. R. Evid. 902(11) (emphasis added).

Neither weakness is fatal to the admissibility of the documents. To lay an adequate foundation under Rule 902(11) (or under Rule 803(6), which Rule 902(11) extends by allowing a written foundation in lieu of an oral one), the "custodian [of the records] need not have personal knowledge of the actual creation of the document." *United States v. Williams*, 205 F.3d 23, 34 (2d Cir. 2000) (quoting *Phoenix Assocs. III v. Stone*, 60 F.3d 95, 101 (2d Cir. 1995)); see also *United States v. Jakobetz*, 955 F.2d 786, 800 (2d Cir. 1992) (holding that a toll receipt incorporated into a business's records qualified as a business record, despite the fact that its custodian had no knowledge of the toll receipt's preparation, because the receipt had been so embedded in the company's business records to allow such an inference of authenticity).

Further, several courts have found that a record of which a firm takes custody is thereby "made" by the firm within the meaning of the rule (and thus is admissible if all the other requirements are satisfied). We join those courts. Thus *United States v. Duncan*, 919 F.2d 981, 986 (5th Cir. 1990), found that there was "no requirement that the [business] records be created by the business having custody of them," so that insurance company custodians could lay an adequate foundation for admitting records compiled by those companies from the business records of hospitals. To the same effect is *United States v. Childs*, 5 F.3d 1328, 1333 (9th Cir. 1993), which accepted documents under Rule 902(11) (such as certificates of title and odometer statements) that

were maintained by an automobile dealership in the regular course of business though not originated by the dealership. See *id.* at 1333-34 (reviewing similar cases); *Matter of Ollag Construction Equipment Corporation*, 665 F.2d 43, 46 (2d Cir. 1981) (finding that "business records are admissible if witnesses testify that the records are integrated into a company's records and relied upon in its day-to-day operations," and noting that relevant financial statements were completed at bank's request and were of a type that the bank regularly used to make decisions whether to extend credit); *United States v. Carranco,* 551 F.2d 1197, 1200 (10th Cir. 1977) (holding that freight bills, though drafted by other companies, were business records of a shipping company because they were "adopted and relied upon by" the shipping company). Compare *United States v. Petrie*, 302 F.3d 1280, 1287-88 (11th Cir. 2002), where the court found no clear error in the district court's finding that certain documents created by defendant and his associates lacked indicia of reliability, and thus no abuse of discretion in exclusion of such documents, notwithstanding the custodian's testimony as to her employer's maintenance of the documents.

Before leaving this topic we must briefly discuss a claim that appears only in Adefehinti's reply brief—a brief in which the opening brief's two-page Rule 902(11) argument burgeons into seven pages. Normally, we would not address a claim originating in the reply brief. See e.g., *Carter v. George Washington University*, 387 F.3d 872, 883 (D.C. Cir. 2004); *United States v. Caicedo-Llanos*, 960 F.2d 158, 164 (D.C. Cir. 1992); *Carducci v. Regan*, 714 F.2d 171, 177 (D.C. Cir. 1983). But appellants' new issues shed light both on what we have just held and on appellants' next theory—the claim that the assertions contained in the 902(11) certificates were testimonial and could thus, under the Confrontation Clause, be introduced only in the form of live testimony.

Adefehinti's reply brief contends that the government offered the loan-supporting documents "to demonstrate that defendants made false statements in those exhibits to the lenders and others." Adefehinti Reply 3. And, in a creative but perplexing formulation, it says that "the alleged false statements contained in the 500 exhibits were most definitely offered for the truth—the 'truth' of their falsity." *Id.*

The first claim is comprehensible but flatly wrong. During a bench conference at which defense attorneys objected to the admission of six loan-related documents, the judge decided to accept the documents into evidence with the explicit understanding that the prosecution could not offer them as evidence of the truth or falsity of their contents: The documents and the financial information represented in them, he said, "are being offered to demonstrate *the basis on which the lender made its decision to loan money*." 10/2/03 PM Tr. 8 (emphasis added). Further, the prosecution and court explicitly recognized that the government needed evidence completely independent of the bank documents to show both (1) the defendants' role in causing the false statements' presence in those documents, as well as in submitting the documents to the banks, and (2) the falsity of the statements. See, e.g., 10/2/03 PM Tr. 4, 12. Adefehinti has not even attempted a sufficiency-of-the-evidence attack on the government's proof of those elements of its case.

As best we can translate the argument that the government offered the documents "for the 'truth' of their falsity," Adefehinti means to say that the government used them to prove that the defendants caused the false assertions to be made. As we have seen, that is simply not the case. The government offered several dozen witnesses, all of whom the defense had an opportunity to cross-examine, to show that defendants were responsible for the false assertions in the loan documents. And it provided completely independent evidence

that the names, phone numbers, addresses, work information, citizenship status, financial information, and other representations of those signing the various loan documents were false and could be traced to defendants—the sufficiency of which, again, Adefehinti does not contest.

We now return to the underlying requirements for 902(11) authentication. The opening clause of Rule 803(6)'s business records exception defines the sort of document involved:

> [a] memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge.

Fed. R. Evid. 803(6). It then imposes the well-known requirements relating to the document's being kept in the regular course of business. In this case, where the documents were "made" by the banks in the sense of being acquired, used and filed by them, the "knowledge" requirement is clearly satisfied if, as the certificates indicated, the persons in charge of the documents' acquisition, use and filing had knowledge of the circumstances in which the acquisition, use and filing occurred. We need not address the question of the requisite knowledge when the record is offered for the truth of the propositions it contains, e.g., that a particular piece of property could properly be appraised at the stated value. See S. Rep. No. 93-1277 (1974), reprinted in 1974 U.S.C.C.A.N. 7051, 7063.

*Alleged Confrontation Clause violation in substitution of Rule 902(11) certificates for live testimony.* Adefehinti argues that the district court's procedure denied him his Sixth Amendment right to confront and cross-examine the numerous declarants who executed the certificates. We note Adefehinti does not argue that the court ever *thwarted* any

effort to call any of the certifying custodians to the stand, and we have found no such ruling. Affirmatively, the contention is that "witness affidavits in the form of Rule 902(11) certificates fit squarely within the Supreme Court's definition of [testimonial] hearsay" in *Crawford*. See Adefehinti Br. 13. Adefehinti maintains that the certificates are "solemn declaration[s] or affirmation[s] made for the purpose of establishing or proving some fact" and are "affidavits," which the Supreme Court classified as belonging to the "core class of 'testimonial statements.'" *Crawford*, 541 U.S. at 51-52.

Our disposition of this issue is simplified by the parties' joint acceptance of the Seventh Circuit's decision in *United States v. Ellis*, 460 F.3d 920 (7th Cir. 2006). Starting from *Crawford*'s explicit conclusion that business records "by their nature were not testimonial" at the time of the Founding, *Crawford*, 541 U.S. at 56, the *Ellis* court extended that principle to evidence laying the foundation for such records' admission: "Given the records themselves do not fall within the constitutional guarantee provided by the Confrontation Clause, it would be odd to hold that the foundational evidence authenticating the records do[es]." 460 F.3d at 927. Adefehinti seeks not to reject but to distinguish *Ellis*. But he does so on grounds that we have already rejected—the argument that, in light of Richter's elucidation of the meaning and basis of the certificates, the documents did not qualify as business records at all.

We note in this connection that Rule 803(6) provides an explicit exception: otherwise qualifying documents are admissible "unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness." Rule 902(11) provides a procedural device for applying this exception (and perhaps others) to certificates, requiring advance notice by a party planning to offer evidence via 902(11) certificates in order "to provide an adverse party with

a fair opportunity to challenge them." In an appropriate case the challenge could presumably take the form of calling a certificate's signatory to the stand. So hedged, the Rule 902(11) process seems a far cry from the threat of *ex parte* testimony that *Crawford* saw as underlying, and in part defining, the Confrontation Clause.

In any event, as the Rule 902(11) certificates here were used only to admit documents acceptable as business records under Rule 803(6), and as the appellants neither attack nor successfully distinguish *Ellis*, we find no error.

\* \* \*

We vacate Adefehinti's and Bode's money laundering convictions for the reasons stated and remand for such re-sentencing as may be appropriate, and otherwise affirm the judgments of the district court in their entirety.

*So ordered.*