Thomas TERRY, Appellant

v.

COMMONWEALTH of Kentucky, Appellee

NO. 2016-CA-001406-MR

Court of Appeals of Kentucky.

DECEMBER 8, 2017; 10:00 A.M.

BRIEFS FOR APPELLANT: Michael L. Goodwin, Louisville, Kentucky.

BRIEF FOR APPELLEE: Andy Beshear, Attorney General of Kentucky, Perry T. Ryan, Assistant Attorney General, Frankfort, Kentucky.

BEFORE: COMBS, J. LAMBERT, AND NICKELL, JUDGES.

## OPINION

LAMBERT, J., JUDGE:

Thomas Terry has directly appealed from the judgment of the Jefferson Circuit Court, entered following a jury trial and convicting him of complicity to first-degree assault, complicity to first-degree burglary, and to intimidating a participant in the legal process. The court sentenced Terry to eleven years' imprisonment. We affirm the judgment of conviction.

In May 2015, the Jefferson County grand jury indicted Terry on multiple counts related to a home invasion almost four years earlier on July 5, 2011, at the Kingswood Way residence of Constance and John Anderson.[1] John also sustained injuries from being shot during the crime. Blood collected from the scene was identified as being a mixture of John's and Terry's blood, and John's stolen credit card was used shortly thereafter in Georgia, where Terry reported he was visiting. As a result, Terry was charged with two counts of complicity to first-degree robbery pursuant to Kentucky Revised Statutes (KRS) 515.020 and KRS 502.020 (as to both Constance and John), and one count each of complicity to first-degree assault pursuant to KRS 508.010 (as to John), complicity to first-degree burglary pursuant to KRS 511.020 (as to John), complicity to first-degree wanton endangerment pursuant to KRS 508.060 (as to Constance), and complicity to intimidating a participant in the legal process pursuant to KRS 524.040 (as to Constance).

Terry entered a not guilty plea at his arraignment that month, and the court ordered counsel for both sides to comply with the Rules of Criminal Procedure and the timeframes set forth in the Rules of Practice for Jefferson Circuit Court with respect to discovery. A trial was scheduled for June 1, 2015, but it was later rescheduled for December of that year. Terry's theory of the case was that another person was responsible for the crime because that person's cell phone was found under the Andersons' bed. In addition, he asserted that the blood evidence had been corrupted.

On August 3, 2015, the Commonwealth filed a supplemental response to the court's pretrial discovery order, which consisted of "additional discoverable materials" that had recently come into its possession. This additional material was an investigative letter dated July 21, 2015, from Sergeant Josh Myers, and it read as follows:

> When preparing for trial in the beginning of June 2015, I noticed that my case file did not include any documentation of the statements made by Terry Thomas when he was served with the search warrant in Hardin County on September 26, 2012. This letter is to serve as documentation for those statements.
>
> Myself, along with Sgt. Emery Frye and Deputy C. Browder, Hardin County Sheriff's Office met with Mr. Terry in Hardin County on September 26, 2012[.] He] was presented with his copy of the signed search warrant authorizing the collection of his buccal standards. Mr. Terry asked what the warrant was in reference to. I advised that we were investigating a home invasion and shooting where his DNA in the form of blood was potentially present at the scene. I told Mr. Terry that the buccal standard was needed for the lab to conduct a comparison to the possible match.
>
> Mr. Terry then asked when and where the offense occurred. I informed Mr. Terry that the incident took place on July 5, 2011 at an address on Kingswood Way in Shively. Mr. Terry responded to this by saying "it couldn't have been me because I was in Atlanta on that day".

---

1. Terry had been originally indicted in relation to these offenses in 2012 (Action No. 12-CR-003356), when he was charged with first-degree assault, first-degree burglary, and first-degree wanton endangerment. Terry was re- indicted under the current action number, and the earlier criminal action was dismissed on motion of the Commonwealth on February 16, 2016.

Mr. Terry went on to say that he spends a lot of time in the Atlanta area.

During this exchange, Mr. Terry became increasingly agitated. At first, Mr. Terry refused to comply with the order to collect his buccal standard. Only after a lengthy conversation, and . convincing Mr. Terry that he had to comply did he final [sic] allow the collection. No questioning took place at this time.

Prior to the trial, Terry filed a motion *in limine* to exclude any references to a DNA database match and moved to suppress and exclude any oral incriminating statements and evidence related to the buccal sample collection detailed in the letter above.[2] The Commonwealth, in turn, filed a motion *in limine* pursuant to Kentucky Rules of Evidence (KRE) 402, 403, 608, and 611 to preclude Terry from impeaching retired Kentucky State Police Lab Technician Dawn Katz related to her work in another criminal case and a civil suit filed in federal court. Ms. Katz had performed testing to determine whether samples collected from the crime scene were blood and, if so, human blood. The Commonwealth stated that Terry's counsel had sought to impeach Ms. Katz in several other cases regarding her testimony in a 1993 rape case where she testified about her visual analysis of hair samples. She testified that the hair samples matched the defendant's hair, but mitochondrial DNA testing performed years later excluded the defendant as the source of the hairs. In other words, her testimony was proven to be inaccurate, causing the defendant to be wrongfully convicted. The Commonwealth argued that because Ms. Katz would be testifying as "little more than a chain of custody witness, whose testimony would last all of ten minutes" and that another lab technician would also be testifying that the samples were human blood, Terry should not be permitted to impeach her based upon her testimony in the 1993 case. Terry's response to the motion, which the court mentioned had been filed in its opinion and order ruling on the motions, is also not in the record on appeal.

The court held an evidentiary hearing on December 11, 2015, where the court permitted the parties to argue their respective positions. Terry argued that the inculpatory statement identified in the July 21, 2015, investigative letter had been known to the Commonwealth, but had not been turned over for several years, and the Commonwealth argued that while there was some level of miscommunication due to transfers in the case, Terry failed to show that he was prejudiced as he had had the information for several months. The Commonwealth also argued that Sgt. Myers was not attempting to elicit information from Terry. The parties went on to discuss the Commonwealth's motion *in limine* regarding Ms. Katz's impeachment. The Commonwealth said Ms. Katz was little more than a chain of evidence witness and that she had run tests to determine whether the samples from the crime scene were human blood before sending it to the Frankfort lab for DNA analysis, which was the issue in this case. The Commonwealth also pointed out that the hair analysis upon which the credibility issue was based happened more than twenty years ago.

Sgt. Myers of the Shively Police Department testified for the Commonwealth at the hearing. He had obtained a search warrant for Terry's buccal swab in Hardin County, where he was in jail on unrelated charges. After Sgt. Myers told him the date of the home invasion, Terry said,

---

**2.** Terry's motions and the Commonwealth's responses are not included in the certified record on appeal.

"This couldn't have been me because I was in Atlanta." Terry asked him three questions regarding Sgt. Myers' investigation. The conversation then turned to whether Terry would submit to the test, and Sgt. Myers said Terry was reluctant to allow him to perform it.

Sgt. Myers went on to explain that Terry had originally been indicted in October 2012, and Sgt. Myers had worked with the original prosecutor on discovery matters. Sgt. Myers believed Terry's statement about being in Atlanta was an important piece of the case "puzzle" that was discussed with the prior prosecutor, but the statement was not put into written form until July 2015. On cross-examination, Sgt. Myers admitted that he had not informed Terry of his *Miranda* rights during the September 2012 collection of the buccal swab pursuant to the warrant, even after telling Terry that his suspected blood had been found at the Andersons' residence. On redirect examination, Sgt. Myers said that his answers to Terry's questions were not meant to elicit a response from Terry. The court orally granted Terry a continuing trial objection to any DNA testimony and indicated an order on the remaining issues would be forthcoming.

The court entered a written opinion and order on December 14, 2015 (the first day of the trial), ruling on the pre-trial motions. The court explained that Terry was attempting to suppress any reference to a database match as well as his statement that "it couldn't have been me. I was in Atlanta." The court denied Terry's motion related to the database match, stating that it and "counsel may take steps to avoid prejudice to the Defendant with proper instructions." It also granted Terry's motion related to testimony that he was reluc-

tant to provide a buccal sample. However, the trial court denied Terry's motion related to a *Miranda* violation, finding that from Terry's perspective, there was "no indication that [he] *believed* that a response to Detective Myers was required. In short, the brief exchange described in Detective Myers testimony is not the 'functional equivalent' of interrogation anticipated in [*Rhode Island v. Innis*, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980)], see *Watkins v. Commonwealth*, 105 S.W.3d 449 (Ky. 2003)."

In addition, the court denied Terry's motion related to the discovery violation, although it noted that the nearly three-year delay in disclosing this statement was "disturbing." The court set forth the procedural timeline as follows: [3]

The Court entered its Order of Arraignment and Discovery on November 5, 2012. The Commonwealth made its first disclosure in response to that Order on December 14, 2012. That Response stated that the Commonwealth "is currently unaware of any oral incriminating statements which may be included in the tendered discovery. Should any statements or reports become known, they shall promptly be provided." On May 24, 2013, the Defendant filed his Motion for Specific Exculpatory or Otherwise Discoverable Evidence Concerning DNA and/or Forensic Testing. Present defense counsel entered his appearance on February 13, 2014 and the current Assistant Commonwealth's Attorney entered the case on November 17, 2014. On August 3, 2015, detective Myers' Investigative Record was disclosed.

The court reasoned that while Kentucky Rules of Criminal Procedure (RCr) 7.24 provides that the Commonwealth, upon

---

**3.** With the exception of the July 21, 2015, investigative letter, none of the documents and filings listed in below were included in the certified record on appeal. Rather, these filings appear to be from the earlier criminal action.

written request, must disclose any known oral, incriminating statement a defendant has made, suppression is not mandatory. The court opted to deny this part of the motion.

Finally, the court considered the Commonwealth's motion *in limine* related to Terry's ability to impeach Ms. Katz. The Commonwealth reported that the blood samples had been retested once they reached the KSP lab. After setting forth the applicable rules of evidence, the trial court ruled as follows:

> [Counsel] for the Defendant emphasizes the fact that cross-examination should not be unduly constrained, specifically as it pertains to credibility. The Court, however, notes that it may limit such cross-examination as regards matters that were not the subject of direct examination. Based on the statements of the Commonwealth, it may not be necessary to examine Ms. Katz as to the tests she performed, limiting her testimony only to her possession and control of the samples and their transmission to KSP. However, it is impossible to know, on a pretrial basis, what Ms. Katz's testimony on this issue will be. Therefore, the Court will reserve ruling on this matter pending her trial testimony.

By separate order, the court granted Terry a continuing objection to the admission of all DNA evidence in the case.

A jury trial was held over four days beginning on December 14, 2015. At the conclusion of the trial, the jury returned verdicts finding Terry guilty of two counts of complicity to first-degree robbery as to both John and Constance, of complicity to first-degree assault, of complicity to first-degree burglary, and of complicity to intimidating a participant in the legal process. Following the penalty phase, the jury recommend sentences of eleven years for the robbery, assault, and burglary convic-

tions and of one year for the intimidation conviction, all to be served concurrently. The court entered an order on February 3, 2016, setting forth the jury's decision and stating that the wanton endangerment charge had been dismissed. The matter was scheduled for formal sentencing in March 2016. The court entered a judgment of conviction on April 5, 2016, and this belated appeal now follows.

On appeal, Terry raises arguments related to whether his oral statement should have been suppressed, whether his cross-examination of Ms. Katz was impermissibly limited, whether the lead detective was improperly allowed to testify as to his opinion about the shooting victims' ability to accurately describe their assailants, whether the circuit court improperly removed a juror by designating her as an alternate, and whether the circuit court erred in allowing the Commonwealth to introduce credit card records. The Commonwealth disputes all of Terry's arguments.

For his first argument, Terry contends that his statement that he could not have committed the crime because he was in Atlanta on the date of the home invasion should have been suppressed, first, because it was made during a custodial interrogation without having been warned of his *Miranda* rights and, second, based on a discovery violation. We disagree with both parts of this argument.

This Court's standard of review of a ruling on a motion to suppress is twofold. First, a reviewing court must determine whether the lower court's findings of fact are supported by substantial evidence. If so, such findings are conclusive. RCr 9.78; *Adcock v. Commonwealth*, 967 S.W.2d 6, 8 (Ky. 1998). Second, the court must perform a *de novo* review of those factual findings to determine whether the decision is correct as a matter of law.

*Ornelas v. United States*, 517 U.S. 690, 697, 116 S.Ct. 1657, 1662, 134 L.Ed.2d 911 (1996); *Commonwealth v. Banks*, 68 S.W.3d 347, 349 (Ky. 2001); *Garcia v. Commonwealth*, 185 S.W.3d 658, 661 (Ky. App. 2006); *Stewart v. Commonwealth*, 44 S.W.3d 376, 380 (Ky. App. 2000).

■■■ "At a suppression hearing, the ability to assess the credibility of witnesses and to draw reasonable inferences from the testimony is vested in the discretion of the trial court." *Pitcock v. Commonwealth*, 295 S.W.3d 130, 132 (Ky. App. 2009) (citing *Commonwealth v. Whitmore*, 92 S.W.3d 76, 79 (Ky. 2002)). "On review, the appellate court should not reevaluate the evidence or substitute its judgment of the credibility of the witnesses for that of the jury." *Commonwealth v. Suttles*, 80 S.W.3d 424, 426 (Ky. 2002) (citing *Commonwealth v. Jones*, 880 S.W.2d 544 (Ky. 1994)). "In conducting our review, our proper role is to review findings of fact only for clear error while giving due deference to the inferences drawn from those facts by the trial judge." *Perkins v. Commonwealth*, 237 S.W.3d 215, 218 (Ky. App. 2007) (citations omitted).

In *Miranda v. Arizona*, 384 U.S. 436, 478-79, 86 S.Ct. 1602, 1630, 16 L.Ed.2d 694 (1966), the United States Supreme Court set forth the procedural safeguards that must be used to protect individuals in custody:

> [W]e hold that when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized. Procedural safeguards must be employed to protect the privilege and unless other fully effective means are adopted to notify the person of his right of silence and to assure that the exercise of the right will be scrupulously honored, the following measures are required. He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires. Opportunity to exercise these rights must be afforded to him throughout the interrogation. After such warnings have been given, and such opportunity afforded him, the individual may knowingly and intelligently waive these rights and agree to answer questions or make a statement. But unless and until such warnings and waiver are demonstrated by the prosecution at trial, no evidence obtained as a result of interrogation can be used against him.

The Supreme Court, however, held that volunteered statements would not violate its holding:

> In dealing with statements obtained through interrogation, we do not purport to find all confessions inadmissible. Confessions remain a proper element in law enforcement. Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated. There is no requirement that police stop a person who enters a police station and states that he wishes to confess to a crime, or a person who calls the police to offer a confession or any other statement he desires to make. Volunteered statements of any kind are not barred by the Fifth Amendment and their admissibility is not affected by our holding today.

*Id.*, 384 U.S. at 478, 86 S.Ct. at 1630 (footnote omitted). There is no question that Terry was in custody when the officers executed the warrant to collect his buccal swab. The question, then, is whether Terry made this statement as the result of a custodial interrogation. We hold that he did not.

The trial court found that the brief exchange between Terry and Sgt. Myers was not the functional equivalent of an interrogation, citing *Innis, supra.* In *Innis*, the United States Supreme Court stated,

We conclude that the *Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term "interrogation" under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect. The latter portion of this definition focuses primarily upon the perceptions of the suspect, rather than the intent of the police. This focus reflects the fact that the *Miranda* safeguards were designed to vest a suspect in custody with an added measure of protection against coercive police practices, without regard to objective proof of the underlying intent of the police. A practice that the police should know is reasonably likely to evoke an incriminating response from a suspect thus amounts to interrogation. But, since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

*Innis*, 446 U.S. 291, 300-02, 100 S.Ct. 1682, 1689-90 (footnotes omitted). *See also Watkins*, 105 S.W.3d at 451 ("A *Miranda* warning is not required when a suspect is merely taken into custody, but rather when a suspect in custody is subject to interrogation.").

■ In the present case, we must agree with the Commonwealth that Terry was not being interrogated when he made the statement to the officers in the detention center. Rather, it was Terry who was asking the officers questions as they sought to obtain his buccal swab pursuant to the warrant. Once Sgt. Myers responded with details about the date and location of the incident, Terry voluntarily offered the information that he could not be a suspect because he was in Atlanta, not Kentucky, at the time of the home invasion, we presume to provide himself with an alibi and divert their suspicion. We hold that Sgt. Myers' responses to Terry's questions, and Terry's responses to his answers, did not constitute a custodial interrogation in violation of *Miranda*.

■ Next, Terry argues that the Commonwealth's failure to provide him with the oral statement for three years constituted a discovery violation, but he provides no authority to support his position. While the trial court found the nearly three-year delay in providing this information to be disturbing, it did not opt to suppress this evidence. RCr 7.24(11) provides:

If at any time during the course of the proceedings it is brought to the attention of the court that a party has failed to comply with this rule or an order issued pursuant thereto, the court may direct such party to permit the discovery or inspection of materials not previously disclosed, grant a continuance, or prohibit the party from introducing in evidence the material not disclosed, or it

may enter such other order as may be just under the circumstances.

Because the jury trial was rescheduled for December, several months after the Commonwealth had disclosed this information, we find no abuse of discretion in the trial court's decision not to suppress the evidence based upon a discovery violation.

For his second argument, Terry argues that the court improperly limited his ability to cross-examine retired Kentucky State Police forensic biologist Dawn Ross Katz. We review a trial court's evidentiary rulings for abuse of discretion. *Goodyear Tire and Rubber Co. v. Thompson*, 11 S.W.3d 575, 577 (Ky. 2000). "The test for abuse of discretion is whether the trial judge's decision was arbitrary, unreasonable, unfair, or unsupported by sound legal principles." *Id.* at 581. Terry asserts that he was entitled to conduct this cross-examination pursuant to KRE 608(b), KRE 404, and the Confrontation Clause. We disagree.

█ Defense counsel sought to cross-examine Ms. Katz on her testimony in a 1993 trial related to her visual examination of hairs that she said could not be excluded from belonging to the defendant in that action. Mitochondrial DNA testing years later excluded the defendant as the source of the hair, leading to his release from prison. Terry argued that Ms. Katz's prior testimony was false and that she withheld evidence in that she failed to inform the jury that two of the recovered hairs that she did not analyze did not match the defendant. He wanted to demonstrate to the jury "her lack of credibility, and her willingness to hide evidence and testify as an expert to junk science." The Commonwealth stated that it intended to call Ms. Katz to testify as to chain of evidence and the tests she ran to determine whether the substance collected was blood and, if so, whether it was human blood, and that was the extent of her testimony.

The court found Ms. Katz's testimony in the 1993 trial about visual hair analysis to be "far removed" from her testimony in Terry's case, but permitted Terry to preserve her testimony through an avowal. We have reviewed the avowal testimony, in which Ms. Katz denied that she had withheld evidence in the earlier case and stood by her original analysis while acknowledging that the DNA analysis was the better test currently. We find no abuse of discretion in the trial court's ruling to not permit Terry to cross-examine Ms. Katz related to her visual hair analysis in the earlier case.

█ For his next argument, Terry contends that Sgt. Myers should not have been permitted to testify to his opinion about the ability of shooting victims to accurately identify their assailants, based upon his experience in other cases, citing KRE 702, which governs the admissibility of expert testimony. Again, we review this evidentiary ruling for abuse of discretion. *See Goodyear, supra.*

We agree with the Commonwealth that there was no error or abuse of discretion in this ruling, essentially because Sgt. Myers never answered the question about the reliability of John Anderson's description of his assailant, which differed from Terry's general description:

Commonwealth: Based on your experience, having questioned multiple victims in other cases and your experience in this case, how reliable was the original description to you?

Defense: I object to that question, judge.

Judge: I'll overrule it. I'll let him answer. You may answer.

Sgt. Myers: You were asking—I'm sorry.

Commonwealth: How reliable was the original description, in your opinion, just for your own investigative purposes?

Sgt. Myers: It was a very general description to begin with, not as good as a shirt color and clothing, and you know, had a scar on his cheek, or whatever the case may be. So it was general to begin with, and it was obviously a very chaotic scene for the Andersons. That description was never actually given to me, personally.

Sgt. Myers concluded that the description did not ultimately matter based upon the DNA analysis. Therefore, we find no merit in this argument.

Next, Terry raises an argument related to the trial court's decision to name a juror as an alternate and dismissing her at the conclusion of the guilt phase of the trial due to her work schedule. Terry relies upon Kentucky Rules of Civil Procedure (CR) 47.02 and RCr 9.36 to support his argument that the court abused its discretion in doing so. CR 47.02 states, in relevant part, that:

> If the membership of the jury exceeds the number required by law, immediately before the jury retires to consider its verdict the clerk, in open court, shall place in a box the cards bearing numbers identifying the jurors empaneled to hear the case and, after thoroughly mixing them, withdraw from the box at random a sufficient number of cards (one or two, as the case may be) to reduce the jury to the number required by law, whereupon the jurors so selected for elimination shall be excused.

RCr 9.36(3) states that "[n]o prospective juror may be challenged after being accepted unless the court for good cause permits it."

We have reviewed the rather confusing portion of the jury selection process where the parties and the court discussed whether any potential jurors would encounter any hardship if the cases were to last until Friday. Juror 35 (1472781) stated that she was a nurse and that she was scheduled to work from 7:00 p.m. on Thursday until 7:00 a.m. on Friday. At the time, the court indicated it believed she would be able to serve based upon the time the trial was expected to conclude, which was Thursday. Juror 24 (1521046) stated that she was scheduled to work from 2:00 p.m. until 10:00 p.m. on Thursday. The parties agreed that Juror 24 should be stricken due to her work hardship, and the court struck her for cause. Juror 35 was sworn to serve on the jury.[4] At the conclusion of the trial, when discussing the jury, the court stated, "I am going to inquire of Juror 1472781 [Juror 35] if she has gotten coverage for her work schedule which is overnight tonight from 7:00 p.m. to 7:00 a.m., and if not, I'm going to designate her as an alternate in the case, and I'll note your objection to that, Mr. Eggert." Because she had not gotten coverage, the court designated Juror 35 as an alternate.

While certainly the trial court could, and perhaps should, have randomly selected the alternate jurors pursuant to CR 47.02, the court had good cause to dismiss Juror 35 based upon her work conflict when it was clear that the trial was going to continue into Thursday afternoon. We find no abuse of discretion in the trial court's decision to designate Juror 35 as an alternate based upon her work schedule and her inability to find a person to take her twelve-hour, overnight shift.

For his final argument, Terry states that the trial court erred in permit-

---

4. It appears that the Commonwealth mixed up the juror numbers in its brief. Our review confirms that the clerk marked the juror sheet correctly.

ting the Commonwealth to introduce a summary of John Anderson's credit card charges because it did not meet the business records exception to the hearsay rule. John testified that his BB&T credit card was stolen from his wallet during the robbery, and he provided a copy of his BB&T credit card statement to police showing two purchases in Georgia on July 5, 2011, after it had been stolen.[5] The Commonwealth had the page authenticated by Chris Stine, who was an investigator for BB&T.

KRE 803(6) provides an exception to the rule against hearsay for business records of regularly conducted activity:

> A memorandum, report, record, or data compilation, in any form, of acts, events, conditions, opinions, or diagnoses, made at or near the time by, or from information transmitted by, a person with knowledge, if kept in the course of a regularly conducted business activity, and if it was the regular practice of that business activity to make the memorandum, report, record, or data compilation, all as shown by the testimony of the custodian or other qualified witness, unless the source of information or the method or circumstances of preparation indicate lack of trustworthiness. The term "business" as used in this paragraph includes business, institution, association, profession, occupation, and calling of every kind, whether or not conducted for profit.

KRE 902(11) provides for the self-authentication of business records:

> (A) Unless the sources of information or other circumstances indicate lack of trustworthiness, the original or a duplicate of a record of regularly conducted activity within the scope of KRE 803(6)

or KRE 803(7), which the custodian thereof certifies:

> (i) Was made, at or near the time of the occurrence of the matters set forth, by (or from information transmitted by) a person with knowledge of those matters;
>
> (ii) Is kept in the course of the regularly conducted activity; and
>
> (iii) Was made by the regularly conducted activity as a regular practice.

Terry argues that because Stine was not the custodian of the records, the credit card statement could not be admitted.

While there are no published Kentucky cases we could find on point, we agree with the Commonwealth that the opinion of the Supreme Court of Arizona in *State v. Parker*, 231 Ariz. 391, 296 P.3d 54 (2013), is persuasive.

> ¶ 29 At trial, the State introduced evidence of transactions on the Smiths' Capital One credit cards through videotaped deposition testimony of Keri Ward, a Capital One fraud investigator. The State also introduced a report Ward prepared by copying and pasting the Smiths' credit card transaction information from Capital One's database. Parker objected to the report, arguing that it was not prepared in the regular course of business. The trial court overruled the objection.
>
> ¶ 30 Documents prepared solely for purposes of litigation generally are not made in the regular course of business. *See Paddack v. Dave Christensen, Inc.*, 745 F.2d 1254, 1258–59 (9th Cir. 1984) (discussing Federal Rule of Evidence 803(6)). If documents prepared for litigation are mere reproductions of regularly kept database records, however, such documents may qualify as business records. *See U-Haul Int'l, Inc. v. Lumbermens Mut. Cas. Co.*, 576 F.3d 1040,

5. The home invasion took place during the early morning hours of July 5, 2011.

1043-44 (9th Cir. 2009) (discussing federal rule 803(6)); *see also* Jack B. Weinstein and Margaret A. Berger, Federal Evidence § 901.08[2], at 901-84 (Joseph M. McLaughlin ed., 2d ed., rev. 2012) ("[P]rintouts prepared specifically for litigation from databases that were compiled in the ordinary course of business are admissible as business records to the same extent as if the printouts were, themselves, prepared in the ordinary course of business."). This is the case with the records at issue here.

¶ 31   Ward testified that Capital One regularly makes and keeps records of all credit card transactions. She described how merchants and other third parties transmit the information used to create the records. Although the records aid in fraud and police investigations, Ward indicated that the records serve several other business purposes, including billing, tracking spending habits, and resolving customer disputes. These facts qualify the entries in Ward's report as business records.

¶ 32   Further, Ward's report did not change the character of the records. Ward testified that she accessed the Smiths' account information in Capital One's computer and copied and pasted that information into a document she faxed to the police. Although Ward made the report at the request of the police, the information provided was identical to Capital One's business records. Because the report simply repeated information that was admissible as a business record, the report itself was likewise admissible. *See* Ariz. R. Evid. 1006; *U-Haul Int'l, Inc.*, 576 F.3d at 1043-44 (noting that "evidence that has been compiled from a computer database is also admissible as a business record" under corresponding federal rule 803(6)).

¶ 33   Parker argues that there is a double hearsay problem because Ward did not know who transmitted the information into Capital One's database. But courts regularly admit business records even when the testifying witness did not assemble the complete record. *See, e.g., United States v. Langford*, 647 F.3d 1309, 1326 (11th Cir. 2011) (records of credit card transactions properly admitted under federal rule 803(6) despite custodial witness "not hav[ing] personal knowledge of each of the records"); *State v. Veres*, 7 Ariz.App. 117, 125, 436 P.2d 629, 637 (1968) (to same effect), *overruled on other grounds by State v. Osborn*, 107 Ariz. 295, 295, 486 P.2d 777, 777 (1971); *see also* Weinstein's Federal Evidence § 803.08[8][a], at 803-84 to 803-86 ("The witness need not have ... personally assembled the records ...[,] [and t]here is no requirement that the records have been prepared by the entity that has custody of them....."). Trustworthiness and reliability stem from the fact that Capital One regularly relies on the information that third parties submit as part of their ordinary course of business. *See, e.g., United States v. Adefehinti*, 510 F.3d 319, 326 (D.C. Cir. 2007) (listing cases that permit business records of one entity to be admitted as a business record of another entity if the latter entity relies on those records and keeps them in the ordinary course of business). The trial court did not abuse its discretion in admitting this evidence as a business record.

*Parker*, 296 P.3d at 64-65. Arizona's Rule 803(6), under which the Arizona Supreme Court admitted credit card records in this case, is substantially similar to Kentucky's version of this rule of evidence.

This Court, in an unpublished opinion, addressed the issue of the admissibility of credit card records pursuant to KRE 803(6) in a collection action for a balance due on a credit card. We held that because "Haunz's affidavit sets forth with specifici-

ty where the information came from and how it was kept[, w]e find this information reliable." *Lind v. DH Capital Management, Inc.*, 2014 WL 6685569 at *2 (2013-CA-001054-MR) (Ky. App. Nov. 26, 2014).[6]

In the present case, the Commonwealth stated that the record had been authenticated and signed by Stine as the record custodian for BB&T. However, the page of the credit card statement admitted into evidence was not signed by Stine, and it was introduced through John's testimony. There was an affidavit completed by Stine certifying the credit card statement as accurate that the parties discussed with the court during a side bar, but the affidavit was not admitted into evidence, and Stine was not present to testify. John testified that the statement was the one he received in the mail.

While the affidavit certifying to the authenticity of the credit card statement was not admitted, and is therefore not before us for review, we nevertheless find that the credit card statement was reliable based upon the discussion between the parties and the court on the record during the trial as well as John Anderson's identification of the statement as the one he received in the mail. We find no abuse of discretion in the court permitting the record to be admitted.

For the foregoing reasons, the judgment of the Jefferson Circuit Court is affirmed.

COMBS, JUDGE, CONCURS.

NICKELL, JUDGE, CONCURS IN RESULT ONLY.

---

**6.** We cite this case pursuant to CR 76.28(4)(c): "Opinions that are not to be published shall not be cited or used as binding precedent in any other case in any court of this state; however, unpublished Kentucky appellate decisions, rendered after January 1, 2003, may be cited for consideration by the court if there is no published opinion that would adequately address the issue before the court."